739 A.2d 975 (1999)
325 N.J. Super. 447
STATE of New Jersey, Plaintiff-Respondent,
v.
Joe BROWN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 25, 1999.
Decided November 10, 1999.
*976 Ivelisse Torres, Public Defender, for defendant-appellant (William Welaj, Designated Counsel, of counsel and on the brief).
Daniel G. Giaquinto, Mercer County Prosecutor, for plaintiff-respondent (Charles Ouslander, Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges PETRELLA, CONLEY and COBURN.
The opinion of the court was delivered by COBURN, J.A.D.
A Mercer County Grand Jury returned an indictment charging defendant with first-degree robbery, N.J.S.A. 2C:15-1 (count one); second-degree robbery, N.J.S.A. 2C:15-1 (count two); fourth-degree possession of a weapon, a knife, under inappropriate circumstances, N.J.S.A. 2C:39-5d (count three); and third-degree aggravated assault, N.J.S.A. 2C:12-1b(7) (count four). A trial jury found defendant not guilty of count one, guilty of counts two and three, and guilty under count four of the lesser included offense of simple assault, N.J.S.A. 2C:12-1a. The judge merged count four into count two and imposed an extended term on count two of twenty years imprisonment, ten years to be served without parole. The judge imposed a consecutive term on count three of eighteen months imprisonment, nine months to be served without parole. We affirm the judgment.[1]
The crimes occurred on the evening of July 24, 1996. The victim was an elderly woman. Shortly before 9:00 p.m., she left her Hamilton Township home and walked to a nearby Burger King restaurant where she ate and received a receipt marked 9:07 p.m. She crossed the street and entered a Pathmark supermarket *977 where she purchased various items, including a Tastykake Chocolate Junior Yellow Layer Cake and a can of Folger's coffee. She placed those items in her pocketbook and the remaining items in a shopping bag. She received a receipt marked 9:55 p.m., left the store, and started walking home.
When she got to Churchill Avenue, she was hit in the back by an assailant. The blow forced her to fall forward, injuring her elbows and knees, and seriously damaging some of her teeth, which, as a result, had to be replaced with dentures. The assailant grabbed her shopping bag and pocketbook and ran. She looked up and noticed that her attacker, who was running away, was a black male. Her screams of distress brought neighbors to the scene. Someone called for the police, who arrived within minutes.
Four juveniles in the area of Churchill Avenue and South Clinton Street provided the police with a physical description of a man they had recently observed running: "a black male, approximately five seven, medium build, short, cropped hair, white tee-shirt, blue shiny warm-up pants and dark shoes."
Within minutes, a police officer saw a man, the defendant, fitting the description and running away from the direction of the crime. The officer stopped him. He was "breathing very heavily, and he was soaked in perspiration...." The officer noticed a "silvery pointy object protruding from the right front of [defendant's] sweat pants...." More specifically, the officer said that the object, apparently an ordinary kitchen knife with a five-inch long blade, was in defendant's "right front pocket of his running pants, the blade facing up out of the pants towards his face." The officer took the knife. A search of the defendant's left front pocket resulted in the discovery of a Tastykake Chocolate Junior Yellow Layer Cake. Later investigation showed that the cake had the same expiration date, bar code, and serial number as other cakes in the Pathmark where the victim had just shopped.
A search of the area between the crime and arrest scenes resulted in the discovery of the victim's purse. Among other things, it contained her checkbook, the receipts from the two stores, and, most importantly, the Folger's coffee can. Subsequently, defendant's right thumbprint was found to be on the coffee can.
The four juveniles were transported to the arrest scene. An officer testified that two of them identified defendant as the person they had seen running and two indicated that he looked like the person but they were not sure. One of the latter two juveniles testified.

I
Defendant contends that the admission of the hearsay evidence of the identifications made by the three non-testifying juveniles prejudiced his right to a fair trial. This testimony was volunteered by the police officer in an unresponsive answer to a question from the prosecutor. Although defendant did not object when the evidence was received, he later moved for a mistrial on the ground that the evidence was impermissible hearsay. The judge denied the motion and instructed the jury to consider the testimony only for the limited purpose of explaining the conduct of the police in stopping the defendant. The judge twice instructed the jury that it could not consider the identifications as substantive evidence.
The hearsay evidence of the identifications by the non-testifying juveniles was clearly inadmissible. State v. Bankston, 63 N.J. 263, 268-69, 307 A.2d 65 (1973). But "it is axiomatic that `[n]ot every admission of inadmissible hearsay ... can be considered to be reversible error ...; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.'" State v. Winter, 96 N.J. 640, 646, 477 A.2d 323 (1984) (quoting Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476, 484 (1968)).
*978 The Winter Court explained that in these circumstances the resolution of a mistrial motion rests with the sound discretion of the trial judge, and the reviewing court should give deference to the trial judge's determination to give a curative instruction instead of a mistrial.
The decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting. [This Court has] upheld the denial of a mistrial motion based on the trial court's directive to the jury to disregard a prejudicial comment....
Likewise, when weighing the effectiveness of curative instructions, a reviewing court should give equal deference to the determination of the trial court.
[Id. at 646-47, 477 A.2d 323.]
Although defendant now complains that the judge's charge was inadequate, no such objection was raised either time the charge was given, first shortly after the evidence was received without initial objection, and later during the general charge at the end of the case. Consequently, we may infer that the instructions were adequate in the context of this trial. See, e.g., State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971).
We emphasize that the identifications were not based on observations of the defendant during the commission of the crime. At most, they merely confirmed that the defendant was a man the witnesses had seen running in the area. That evidence was confirmed by the juvenile who did testify, and it was, in essence, reconfirmed by the arresting officer's observation of defendant running from the direction of the crime scene and sweating profusely. Moreover, defendant was in possession of the cake just purchased by the victim, and he had left his thumbprint on the coffee can found in her pocketbook. Given the limited importance of the hearsay evidence, the judge's charge, and the overwhelming evidence of defendant's guilt, we are satisfied that the error does not warrant reversal since it was not "clearly capable of producing an unjust result...." R. 2:10-2.

II
Defendant made a timely motion for an acquittal on the charge of first-degree robbery. R. 3:18-1. The judge denied the motion. Although the jury acquitted defendant on this count, he argues that the denial was error and that it prejudiced his right to a fair trial because "the jury may have reached a compromise verdict."
First-degree robbery is defined in N.J.S.A. 2C:15-1b:
Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

[Emphasis added.]
"Deadly weapon" is defined by N.J.S.A. 2C:11-1c
as any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury.
[Emphasis added.]
We are only concerned with the underlined portion of the robbery statute since the charge of first-degree robbery was based solely on defendant's possession of *979 the knife. The question is whether he could have been found to have been armed with a "deadly weapon," as defined by N.J.S.A. 2C:11-1c, simply because a knife was in his pocket during the robbery. The answer is no.
This issue was addressed in State v. Riley, 306 N.J.Super. 141, 703 A.2d 347 (App.Div.1997). In that case, the defendant committed a robbery by knocking the victim to the ground and taking money from his pocket. The defendant, who was immediately detained by a passer-by and arrested when the police arrived a few minutes later, had in his pocket the victim's money and "a three-bladed pocket folding knife, the largest blade being about four inches long." Id. at 145, 703 A.2d 347. The court reversed defendant's conviction for first-degree robbery because this was an ordinary knife, i.e., not a per se or qualified per se weapon within the definitions of N.J.S.A. 2C:39-1r and 2C:39-3e, and because there was no evidence that he used or intended to use the knife in the robbery. Id. at 146-50, 703 A.2d 347. The court concluded that lacking evidence of use or intended use, this ordinary knife was not a deadly weapon within the definition of N.J.S.A. 2C:11-1c. Id. at 149, 703 A.2d 347.
The only differences between Riley and this case is that here the knife, apparently an ordinary kitchen knife, had a fixed, five-inch blade, a small portion of which was protruding from defendant's pocket at the time of his arrest. Those differences are of no moment. As in Riley, the knife was neither held by defendant nor seen by the victim. The only evidence was that it was immediately available to defendant during the robbery. While that establishes that defendant was armed, State v. Merritt, 247 N.J.Super. 425, 429-30, 589 A.2d 648 (App. Div.), certif. denied, 126 N.J. 336, 598 A.2d 893 (1991), it is not sufficient evidence that the weapon was a "deadly weapon" as defined by N.J.S.A. 2C:11-1c. Therefore, the motion to dismiss the first-degree robbery charge should have been granted.
Defendant contends that his conviction for second-degree robbery was tainted by the judge's submission of the first-degree charge to the jury. He argues that State v. Christener, 71 N.J. 55, 362 A.2d 1153 (1976), mandates reversal in these circumstances. We disagree.
In Christener, the jury was instructed on first- and second-degree murder and manslaughter and found defendant guilty of manslaughter. After taking note of the general principle "that jury instructions may only be delivered where they are supported by evidence," id. at 69, 362 A. 2d 1153, the Court expressed its reasons for reversing the conviction in the following manner:
[W]e find that the first degree murder charge in this case was plain and harmful error requiring reversal.... On the record in this case, there was a real possibility that the jury could have found the defendant not guilty. Hence, the possibility that the jury, in the absence of sufficient evidence to sustain a first degree murder charge, may have reached a compromise verdict suggests that Christener may have suffered prejudice by that instruction in spite of his manslaughter conviction.
[Id. at 69-70, 362 A.2d 1153.]
In reaching its conclusion, the Court relied on cases from other jurisdictions "hold[ing] that an unsupported charge on first-degree murder constitutes prejudicial and reversible error even where a verdict is returned by the jury on a different and lesser charge." Id. at 70, 362 A.2d 1153. Although the Court went on to state generally that "[h]enceforth, it should be regarded as error for a trial judge to deliver a jury instruction on a criminal charge for which there is no, or insufficient evidence to support the instruction," id. at 73, 362 A.2d 1153, as is evident from the quotation, the Court did not hold that in every instance such error must be deemed prejudicial and reversible. Consequently, the applicable rule is R. 2:10-2, which dictates *980 that we disregard any error "unless it is of such a nature as to have been clearly capable of producing an unjust result...."
Defendant was not prejudiced in this case because of the manner in which the judge charged the jury. He instructed the jury to first consider and resolve the issue of second-degree robbery. Only if defendant was guilty of that charge was the jury to consider and resolve whether defendant was armed.[2] That is precisely the course followed by this jury, as confirmed by the jury verdict form. After convicting defendant of second-degree robbery, the jury determined that he was not guilty of being armed. In light of the strength of the State's case, unlike the situation in Christener, there was no real possibility that the jury could have found defendant not guilty of second-degree robbery. The victim was found injured and bloody within moments after the robbery. Shortly thereafter, the police found defendant sweating profusely and running away from the direction of the crime. He had the victim's cake in his pocket and he had left his thumbprint on her coffee can. Consequently, we can perceive no basis for defendant's speculation that the verdict resulted from a compromise.

III
Defendant argues that the verdict on count three, possession of a knife under circumstances not manifestly appropriate for its lawful use, was against the weight of the evidence. Since he did not raise this issue in the trial court, he is barred from raising it on appeal. R. 2:10-1; State v. McNair, 60 N.J. 8, 9, 285 A.2d 553 (1972); State v. Pickett, 241 N.J.Super. 259, 265-66, 574 A.2d 1014 (App.Div.1990). Apart from the procedural bar, our review of the transcript reveals that defendant's guilt of this charge was established beyond reasonable doubt.
The applicable statute, N.J.S.A. 2C:39-5d, provides, "Any person who knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime of the fourth degree." A "weapon" is defined as including "anything readily capable of lethal use or of inflicting serious bodily injury." N.J.S.A. 2C:39-1r. That definition contrasts with the definition of "deadly weapon" in N.J.S.A. 2C:11-1c, the latter section focusing primarily on the defendant's use or intended use of the weapon.
In State v. Lee, 96 N.J. 156, 161, 475 A.2d 31 (1984), the Court said that N.J.S.A. 2C:39-5d concerns "the situation in which someone who has not yet formed an intent to use an object as a weapon possesses it under circumstances in which it is likely to be so used." The Court "conclude[d] that the Legislature did not require proof of an intent to use a weapon for an unlawful purpose as an element of a violation of [this statute]." Id. at 163, 475 A.2d 31. The defendant in Lee was arrested shortly after committing a burglary. In his pocket, the police found a pair of scissors partially wrapped in tape so as to form a stiletto-like instrument. Id. at 159, 475 A.2d 31. Those circumstances were found to justify conviction under this statute.
In State v. Wright, 96 N.J. 170, 475 A.2d 38 (1984), appeal dismissed, Wright v. *981 New Jersey, 469 U.S. 1146, 105 S.Ct. 890, 83 L.Ed.2d 906 (1985), the Court sustained a conviction under this statute for a defendant who, when arrested on outstanding warrants, was found to have "strapped to his ankle by a rubber band ... an Exacto knife, with an eight-inch handle and a one-inch razor-like blade, protected by a cardboard sheath." Id. at 172, 475 A. 2d 38.
In State v. Blaine, 221 N.J.Super. 66, 533 A.2d 980 (App.Div.1987), the court found the statute inapplicable to a defendant who had a closed folding knife in his pocket when the police arrested him on a warrant as he walked down the street. The court analyzed Lee and Wright in the following manner:
As we therefore understand the rationale of Lee, where the implement is of an equivocal character, susceptible to both lawful and unlawful uses, its status as a weapon whose possession is capable of subjecting its possessor to criminal liability is entirely dependent on the circumstances attending the possession. See, e.g., State v. Jones, 198 N.J.Super. 553, 569 [565], 487 A.2d 1278 (App.Div. 1985), so construing N.J.S.A. 2C:39-7. Thus, a pair of scissors taped in such a way as to form a homemade stiletto will justify a conviction under N.J.S.A. 2C:39-5(d) when it is found on the person of an intruder into a home. State v. Lee, supra. And an Exacto knife having an eight-inch handle and a one-inch razor-like blade, a tool which has obvious lawful uses, loses its innocent character when strapped to a person's ankle inside his sock. See State v. Wright, 96 N.J. 170, 475 A.2d 38 (1984), app. dism. 469 U.S. 1146, 105 S.Ct. 890, 83 L.Ed.2d 906 (1985).
[Id. at 70, 533 A.2d 980.]
The court then explained its resolution of the case:
The question which is directly before us is whether a knife of the nature here involved is by itself of such a character as to permit a conviction in the absence of any incriminating factor other than its presence in one's pocket as he is walking down the street. We conclude that it is not. Obviously, a folding knife with a four-inch blade can be used lethally and is capable of inflicting serious injury. See N.J.S.A. 2C:39-1(r). But it also has a myriad of perfectly proper uses.... It is not, as in the case of weapons defined by N.J.S.A. 2C:39-3(e), presumptively possessed for purposes which are not lawful and it is, in fact, an implement which is commonly and regularly sold throughout the state as a matter of ordinary commerce. We are constrained, therefore, to conclude that this knife was not of a character whose bare possession, in the absence of a single additional incriminating circumstance, can sustain a conviction of crime.
[Id. at 70-71, 533 A.2d 980 (citations omitted).]
The circumstances of the instant case are analogous to the circumstances of Lee and clearly distinguishable from those of Blaine. As in Lee, here the weapon was possessed by the defendant during the commission of a crime. Since it was readily available to him, he was armed. State v. Merritt, supra, 247 N.J.Super. at 429-30, 589 A. 2d 648. Furthermore, although there is no difference between a folding pocketknife and a kitchen knife for purposes of determining whether the weapon is a deadly weapon under the armed robbery statute, a distinction may be drawn between those weapons under this statute. While a pocketknife belongs in one's pocket, a kitchen knife belongs at home. See State v. Lee, supra, 96 N.J. at 161, 475 A.2d 31 ("A steak knife is appropriate at the dinner table, but sinister when concealed in a car with a BB gun."). Defendant's possession of the kitchen knife in this case can fairly be described as sinister, too. This was a situation in which, even though defendant may not have formed an intent to use the weapon, it was likely to be so used if necessary to accomplish his criminal purpose of robbery. Unlike Blaine, where the defendant was *982 merely walking down the street with a pocketknife, the commission of the crime while armed with a kitchen knife were additional incriminating circumstances which fully warranted the conviction.
In State v. Riley, supra, which parallels this case except for the design of the weapon, the court reversed defendant's conviction of N.J.S.A. 2C:39-5d, saying that "the lack of intent to use the implement [a pocketknife] as a weapon precludes the conclusion that the implement was a weapon." 306 N.J.Super. at 150, 703 A.2d 347. Although we agree that the lack of intent demonstrated that the knife was not a deadly weapon for purposes of the robbery statute, we cannot agree that it was not a weapon, as defined by N.J.S.A. 2C:11-1c. Thus, we understand Riley as turning on the fact that the weapon was merely a pocketknife, an item customarily carried by ordinary citizens, and that in the circumstances of that case there was insufficient evidence that it was likely to be used during the commission of the crime.

IV
Last, defendant argues that the sentence imposed was manifestly excessive. He concedes that he "clearly qualified for extended term treatment in light of his prior convictions." The pre-sentence report describes him as a "27 year old career criminal ... [who] has accumulated 10 juvenile and 18 adult arrests. He has been exposed to institutionalization, probation and parole supervision and nothing has deterred this defendant from his continuing pattern of criminal behavior." The report notes that this was defendant's ninth indictable conviction in Mercer County.
Specifically, the defendant claims that the judge erred in sentencing him to a maximum extended term for the robbery, in ordering parole ineligibility, and in ordering that the sentences be served consecutively. Our review of the record and the judge's expression of his reasons for imposing the sentence in question reveals that this point is without merit and does not warrant discussion in a written opinion. R. 2:11-3(e)(2). The sentencing guidelines were followed, there was substantial evidence supporting the facts underlying the judge's application of the guidelines, and the judge did not clearly err by reaching a conclusion that could not have been reasonably made upon the weighing of the relevant factors. State v. Roth, 95 N.J. 334, 365-66, 471 A.2d 370 (1984).
Affirmed.
NOTES
[1] The sentencing transcript reveals that the judge imposed a nine month period of parole ineligibility, but in the judgment of conviction that period is set at eight months. "Where there is a discrepancy between the trial court's oral pronouncement of sentence and the sentence described in the judgment of conviction, the transcript of the trial judge's remarks controls." State v. Rivers, 252 N.J.Super. 142, 147 n. 1, 599 A.2d 558 (App. Div.1991). Accordingly, we remand to the trial court for entry of an appropriately amended judgment.
[2] The first question on the verdict form read: "How do you find as to the charge of robbery, that the defendant ... did, in the course of committing a theft, inflict bodily injury and/or use force upon, [the victim], on or about July 24, 1996?" The second question on the verdict form, to be answered only if the answer to the first was "yes," read: "Was the defendant... armed with a deadly weapon, to wit: a knife at the time of the commission of the robbery?" We do not mean to indicate by this opinion that the issues should have been submitted in that manner. See State v. Diaz, 144 N.J. 628, 677 A.2d 1120 (1996). But given the not guilty verdict on the armed "charge," we perceive no prejudice to defendant. Had the jury been asked to first resolve whether defendant was guilty of first-degree robbery, a stronger argument could have been made that the result was a compromise verdict. But that was not the situation.