894 A.2d 8 (2006)
384 N.J. Super. 29
STATE of New Jersey, Plaintiff-Respondent,
v.
Ron Ray HARRIS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2006.
Decided March 17, 2006.
*13 Michael B. Jones, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Jones, of counsel and on the brief).
Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Zulima V. Farber, Attorney General of New Jersey, attorney; Mr. Yomtov, of counsel and on the brief).
Before Judges CUFF, PARRILLO and HOLSTON, JR.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Following denial of his motion to suppress, and after a jury trial, defendant, Ron Ray Harris, was found guilty of third-degree possession of a controlled dangerous substance, cocaine, with intent to distribute, N.J.S.A. 2C:35-5b(3) (Count I); second-degree possession of cocaine with intent to distribute within 500 feet of public property, N.J.S.A. 2C:35-7.1 and N.J.S.A. 2C:35-5a(1) (Count II); second-degree unlawful possession of a weapon, a knife, while in the course of committing a violation of a CDS crime, specifically N.J.S.A. 2C:35-5 and N.J.S.A. 2C:35-7.1, N.J.S.A. 2C:39-4.1b (Count III); third-degree attempted hindering apprehension, N.J.S.A. 2C:29-3b (Count IV); and fourth-degree possession of a weapon by a previously convicted person, N.J.S.A. 2C:39-7 (Count V).[1]
Following the merger of Counts I and II, defendant was sentenced on his conviction of second-degree possession of cocaine with intent to distribute within 500 feet of public property (Count II), to a ten-year term of imprisonment, with five years of parole ineligibility. On his conviction of second-degree possession of a knife while *14 committing a CDS crime (Count III), defendant was sentenced to a mandatory consecutive term of ten years imprisonment. For his conviction of third-degree attempted hindering (Count IV), defendant received a concurrent five-year prison term, and on the fourth-degree possession of a weapon by a previously convicted person (Count V), a concurrent eighteen-month term of imprisonment. Defendant was also sentenced on a disorderly persons offense of marijuana possession to six months of county jail time to run concurrently to Count II. Defendant's aggregate sentence was twenty years' imprisonment, with five years' parole ineligibility. Appropriate fees and penalties were also imposed. Defendant appeals. For reasons that follow, we reverse the convictions on Counts I, II and III, and affirm in all other respects.
These are the salient facts. On September 28, 2001, at about 10:00 p.m., Detective Joseph McGrath of the Wildwood Crest Police Department arrived at the neighboring City of Wildwood police station, where he asked Detective John Clemens, a member of the Wildwood Police Department, for assistance in an unrelated investigation involving an individual believed to be at Henry's Bar in Wildwood. The two plain-clothed detectives left in an unmarked police vehicle, parked their car on the east block of Spicer Avenue, which faced Pacific Avenue. McGrath entered the bar alone, while Clemens remained outside in the police vehicle.
While Clemens remained in the police car, he noticed two males walking south on Pacific Avenue. One of them, the defendant, appeared to be counting a large sum of money. Defendant and the other man, David Jefferson, continued walking south on Pacific Avenue, but stopped when they saw McGrath leave Henry's Bar and reversed direction. After McGrath entered the police car, the detectives pulled away and crossed the intersection of Pacific Avenue onto the 200 block of Spicer Avenue. Clement looked over his shoulder, and he noticed that Jefferson and defendant had disappeared.
Clemens knew that there was a nearby alleyway because, in the course of conducting narcotics investigations in this high-crime, high-drug trafficking location, he himself utilized the location to observe various drug deals. The detectives made a U-turn, and they returned to the same place they had previously parked on Spicer. They exited the car, and McGrath went around to the back of the building while Clemens entered the opposite side of the alleyway to prevent the two men from running away.
When the detectives entered the alleyway, they saw defendant and Jefferson. A torn up piece of a cigar and tobacco, which Clemens suspected to be a "blunt"a hollowed out cigar used for smoking marijuanalaid at the feet of the two men. Clemens recognized defendant from previous arrests on drug charges[2] and attempted to speak with him, but defendant was having difficulty conversing, as if he were concealing something in his mouth. Clemens asked defendant to spit out whatever he had in his mouth. Defendant, who had been uncharacteristically friendly, complied. The object was a plastic bag that contained a brownish-greenish vegetation, later determined to be marijuana.
Defendant was placed under arrest and searched at the scene. A small, folding, pocket-sized knife was found folded in the *15 front right pocket of defendant's pants. Also, $1324 cash was found in defendant's front left pants pocket in the following denominations: two $100 bills; one $50 bill; forty-five $20 bills; fourteen $10 bills; five $5 bills; and nine $1 bills. At this point, both defendant and Jefferson were brought to the police station.
At headquarters, Clemens suspected that defendant might have additional contraband concealed on his person and consequently obtained permission from the on-duty sergeant to conduct a strip search. After disrobing defendant, Clemens observed a sandwich-type baggie in the seam of defendant's buttocks. When defendant refused to remove the item from his buttocks, he was told to put his clothing back on while Clemens conferred with his supervisor, Lieutenant Regalbuto. After speaking with officials at the county jail who directed the Wildwood Police to conduct the search, the Lieutenant and Clemens, along with two patrolmen, returned to the room and asked defendant once again to remove his clothing. Defendant informed the officers that they would "have to take it" out.
The handcuffed defendant resisted removal by using his upper body and leg strength, which required the police to take defendant to the ground. The police laid defendant face down on the ground and tried to force his legs open. Defendant had clasped his fingers around his belt, preventing the officers from removing his pants. Clemens then employed a compliance hold, got defendant to remove his hands from his belt, and eventually succeeded in removing defendant's pants.
The police still struggled to remove the baggie from defendant's buttocks as he clenched his buttocks together tightly. However, after physically forcing defendant's buttocks apart, the police managed to extract the sandwich baggie. Inside the bag were eighteen individually packaged, "heat-sealed straws" that contained an off-white, rock-like substance, which later tested positive for cocaine.
In denying defendant's motion to suppress, the judge reasoned:
Clearly this officer [Clemens] testified in a credible manner. Nothing was presented to suggest to the contrary that on the date of the stop . . . he was patrolling in a high-crime, high-drug area, [and] observed the defendant walking down a street with another individual. He believed that he saw the defendant counting money. He believed it to be a large amount, although I question whether or not that recollection wasn't bolstered by his actual seizure of the cash. But certainly there's no basis to disbelieve his testimony that he saw the defendant counting money. They basically then disappeared, . . . after having observed him in his vehicle, . . . because they recognized him as law enforcement.
He looked, continued to try to attempt to see their whereabouts. They disappeared. He believed that they had gone into an alleyway . . . . He was familiar with that alleyway, called for backup. Walked into the alleyway, recognized the defendant, saw a torn-up cigar on the ground, obviously the makings of a blunt. At that point he noticed that the defendant could not speak that well. He had trouble opening his mouth, and he appeared to be very friendly and cooperative with the officer, unlike prior arrests in the past when he had been extremely difficult to deal with. It was the officer's conclusion at that point that there was something suspicious, that the defendant was being apprehended and had decided to be so friendly and cooperative. When the item was removed from the defendants mouth he saw that *16 it was a controlled dangerous substance, in fact marijuana.
The defendant was searched while he was standing in the alleyway, at which time the officer discovered a folding knife in the defendant's pocket, as well as $1,324 in his left front pocket. He took the defendant back to the police station, asked for authorization to do a strip search because he believed that the defendant had contraband, other drugs, hidden somewhere, either in his clothing or about his person.
The officerI don't have it in my notes, that he attempted to get the county jail or some hospital to examine his body cavities, but for some reason I believe that to be the case. Certainly there came a point in time when the officer's only choice was to either conduct the strip search himself or merely take the defendant to the county jail as he was being charged with indictable matters.
I find at that point that the officers had the right to remove the defendant's clothing and examine his body cavities. Not surprisingly, during the course of being searched he became extremely difficult because he knew he was about to have his drugs seized. The search and the fruits of that search are admissible either because it was a search incident to arrest for both contraband as well as weapons, or because the officers had abundant probable cause to believe that the defendant was hiding drugs on his person. And, in any event, inevitably those drugs would have been discovered when the defendant would have been taken to the county jail. I'm not clear even as I speak as to why it was they didn't just charge him with the indictable, take him to the county jail and sort of drop him off there. For whatever reason they decided not to do that, or the county jail was too busy to take the inmate and, accordingly, they ended up doing it.
. . . .
The motion is denied.
At the ensuing trial, the same evidence was adduced as at the suppression hearing. In addition, the State's expert, Sergeant Michael Hickman of the Cape May Prosecutor's Office, testified that heat sealed straw cuts is a style of drug packaging indigenous to Wildwood, and that frequently $10 and $20 bills are used in drug transactions. In his opinion, drug dealers frequently hide drugs inside their bodies and that drugs possessed under similar circumstances are intended for distribution.
As noted, defendant was convicted of the various drug and weapon offenses charged. On appeal, he raises the following issues:
I. THE JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS BECAUSE THE STOP OF DEFENDANT AND BOTH SUBSEQUENT SEARCHES WERE UNLAWFUL AND UNCONSTITUTIONAL IN VIOLATION OF DEFENDANT'S RIGHTS UNDER U.S. CONST., AMENDS. IV, XIV; N.J. CONST. (1947), ART. 1, PAR. 7.
A) The Investigatory Stop and Initial Search of Defendant Was Unlawful.
B) The Strip Search at the Police Station Was Unreasonable and Unsupported by Probable Cause.
II. THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR POSSESSION OF A WEAPON WITH THE PURPOSE TO USE IT UNLAWFULLY *17 DURING THE COMMISSION OF A VIOLATION OF N.J.S.A. 2C:35-5 AND THE JURY VERDICT SHEET WAS MISLEADING. DEFENDANT'S CONVICTION MUST BE REVERSED. (Partially raised below.)
A) The Evidence Was Insufficient to Support Conviction.
B) The Jury Verdict Sheet was Misleading and Defendant's Conviction Must be Reversed and Remanded.
III. WHEN DEFENDANT REFUSED TO CONTINUE TO ATTEND TRIAL BECAUSE HE BELIEVED HIS ATTORNEY WAS NOT ADEQUATELY REPRESENTING HIM, THE JUDGE ERRED BY NOT CONDUCTING AN INQUIRY UNDER FARETTA AS TO WHETHER THE DEFENDANT WISHED TO REPRESENT HIMSELF AND WAS CAPABLE OF DOING SO. (Not raised below.)
IV. DEFENDANT'S SENTENCE OF TEN YEARS FOR POSSESSING A FOLDED POCKET KNIFE WHILE POSSESSING A C.D.S. WITH THE INTENT TO DISTRIBUTE IT IS GROSSLY EXCESSIVE AND MUST BE REDUCED.
V. DEFENDANT'S SENTENCE VIOLATES THE PRECEPTS OF BLAKELY V. WASHINGTON AND MUST BE REMANDED.

(i)
Defendant contends the initial stop was unsupported by reasonable suspicion and the subsequent searches unsupported by probable cause. We conclude that police conduct up to and including the seizure of the baggies from defendant's mouth was lawful, but that the strip search at the police station was unreasonable and lacking in probable cause.
Police-citizen encounters generally occur at three distinct levels, but only two require constitutional justification. State v. Pineiro, 181 N.J. 13, 20-21, 853 A.2d 887 (2004). "`It is well-settled that the police may arrest only if they have probable cause; may stop for brief investigatory questioning if they have an articulable, reasonable basis for suspicion; and they may make an inquiry without any grounds or suspicion.'" State v. Sirianni, 347 N.J.Super. 382, 387, 790 A.2d 206 (App.Div.) (quoting State v. Rodriguez, 336 N.J.Super. 550, 558-59, 765 A.2d 770 (App.Div.2001), rev'd, 172 N.J. 117, 796 A.2d 857 (2002)), certif. denied, 172 N.J. 178, 796 A.2d 894 (2002); see also Florida v. Royer, 460 U.S. 491, 497-99, 103 S.Ct. 1319, 1323-25, 75 L.Ed.2d 229, 236-37 (1983) (plurality opinion); State v. Maryland, 167 N.J. 471, 482-84, 486-87, 771 A.2d 1220 (2001); State v. Alexander, 191 N.J.Super. 573, 576, 468 A.2d 713 (App. Div.1983), certif. denied, 96 N.J. 267, 475 A.2d 570 (1984). Mere inquiries require no constitutional justification. Ibid.; State v. Stovall, 170 N.J. 346, 356, 788 A.2d 746 (2002); State v. Dangerfield, 339 N.J.Super. 229, 236, 771 A.2d 642 (App.Div.2001), aff'd as modified, 171 N.J. 446, 795 A.2d 250 (2002). On-the-spot questioning involves neither detention nor seizure in the constitutional sense. State v. Sheffield, 62 N.J. 441, 447, 303 A.2d 68, cert. denied, 414 U.S. 876, 94 S.Ct. 83, 38 L.Ed.2d 121 (1973); State v. Abreu, 257 N.J.Super. 549, 554-55, 608 A.2d 986 (App.Div.1992). Brief, non-intrusive encounters with individuals on the street or in parked cars implicate none of the privacy or security *18 concerns engendered by discretionary police spot checks of moving vehicles. See Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). As the United States Supreme Court held in Royer:
[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.
[Royer, supra, 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236.]
See also State v. Nishina, 175 N.J. 502, 510, 816 A.2d 153 (2003).
To be sure, "a single encounter may escalate from `inquiry' to `stop' to `arrest' so that the criteria for each category must be applied as the situation shades off from one category to the other." Alexander, supra, 191 N.J.Super. at 577, 468 A.2d 713 (citing Sheffield, supra, 62 N.J. at 447-48, 303 A.2d 68). An inquiry may be converted into an investigative detention if, given "the totality of the circumstances, `a reasonable person would have believed that he was not free to leave.'" State v. Contreras, 326 N.J.Super. 528, 538, 742 A.2d 154 (App.Div.1999) (quoting State v. Tucker, 136 N.J. 158, 164, 642 A.2d 401 (1994)); see also Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed. 2d 889, 906 (1968); State v. Citarella, 154 N.J. 272, 280, 712 A.2d 1096 (1998); State v. Davis, 104 N.J. 490, 498, 517 A.2d 859 (1986); State v. Williams, 381 N.J.Super. 572, 590, 887 A.2d 190 (App.Div.2005); State v. Costa, 327 N.J.Super. 22, 31, 742 A.2d 599 (App.Div.1999); State v. Morrison, 322 N.J.Super. 147, 152, 730 A.2d 447 (App. Div.1999). In determining whether the encounter passes constitutional muster, a reviewing court must assess and evaluate the totality of the circumstances surrounding the encounter. Maryland, supra, 167 N.J. at 486-87, 771 A.2d 1220; Davis, supra, 104 N.J. at 505, 517 A.2d 859. As always, "`the touchstone of the fourth amendment [of the United States Constitution, as well as Article I, & 7 of the New Jersey Constitution,] is reasonableness.'" State v. Zapata, 297 N.J.Super. 160, 171, 687 A.2d 1025 (App.Div.1997) (quoting State v. Bruzzese, 94 N.J. 210, 217, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984)), certif. denied, 156 N.J. 405, 719 A.2d 637 (1998).
Our Court has explained that:
"The standards by which the reasonableness of police conduct involving an investigatory stop of a person or an automobile [are evaluated] originate with Terry v. Ohio . . . . [which] stated that the reasonableness of the police conduct in conducting an investigatory stop in light of the Fourth Amendment could be generally assessed by `balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' The facts used in that balancing test are to be judged objectively: `would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?' When determining if the officer's actions were reasonable, consideration must be given `to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.' Neither `inarticulate hunches' nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights. Rather, the officer `must be able to point to specific and articulable facts which, taken together with rational *19 inferences from those facts, reasonably warrant [the] intrusion.'"
[Pineiro, supra, 181 N.J. at 21, 853 A.2d 887 (quoting State v. Arthur, 149 N.J. 1, 7-8, 691 A.2d 808 (1997)) (second alteration in original).]
Of course, the most intrusive police-citizen encounter involves a search and arrest, which must be supported by "probable cause." This concept "is not susceptible of precise definition." State v. Moore, 181 N.J. 40, 45, 853 A.2d 903 (2004) (citing State v. Wilson, 178 N.J. 7, 13, 833 A.2d 1087 (2003)). However, it is well-settled "that a principal component of the probable cause standard `is a well-grounded suspicion that a crime has been or is being committed.'" Ibid. (quoting Nishina, supra, 175 N.J. at 515, 816 A.2d 153 (2003)). "Probable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." Id. at 46, 853 A.2d 903 (quoting Schneider v. Simonini, 163 N.J. 336, 361, 749 A.2d 336 (2000) (alterations in original), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001)). In other words, substantively, "`all the definitions of probable cause [must include] a reasonable ground for belief of guilt.'" Ibid. (quoting Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 800, 157 L.Ed.2d 769 (2003)).
In this case, whether or not the initial approach from both sides of a dark alleyway to prevent defendant's flight constituted an "investigatory detention," it is clear that by the time of the police officers' first face-to-face encounter with defendant there was a reasonable suspicion of criminal activity. The detectives were in a high-crime, high drug area at night and observed defendant and his companion reversing direction and ducking into a dark alley upon being spotted counting a large amount of cash. In addition, before any verbal encounter with defendant, the detectives observed a "blunt," which they associated with marijuana use, at the feet of both men. Unquestionably, the police were in a public alleyway, where they were lawfully allowed to be, when they inadvertently observed, in plain view, drug paraphernalia at defendant's feet. See State v. Johnson, 171 N.J. 192, 206-07, 793 A.2d 619 (2002); State v. Demeter, 124 N.J. 374, 380-84, 590 A.2d 1179 (1991); see also State v. Padilla, 321 N.J.Super. 96, 108, 728 A.2d 279 (App.Div.), certif. denied, 162 N.J. 198, 743 A.2d 850 (1999); State v. Smith, 306 N.J.Super. 370, 380-81, 703 A.2d 954 (App.Div.1997). These are specific and articulable facts which, taken together with rational inferences from these facts, support a reasonable suspicion of criminal activity. Therefore, the police conduct in detaining defendant and engaging him "in brief investigatory questioning [was] reasonable . . . ." State ex rel. A.S., 227 N.J.Super. 541, 546-47, 548 A.2d 202 (App.Div.1988).
The official request of defendant to spit out the substance in his mouth was likewise reasonable. Assuming, without deciding, that such a request constituted a full-blown "search," we conclude this official action was reasonable in light of further developments that elevated the officers' reasonable suspicion to probable cause. In the first place, one of the detectives recognized defendant as an area drug dealer. Undoubtedly, police may rely on their knowledge of a suspect's "`prior arrest [and conviction] record.'" State v. Hayes, 327 N.J.Super. 373, 380, 743 A.2d 378 (App.Div.2000) (quoting Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, 85 *20 L.Ed.2d 479 (1985)); United States v. Harris, 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723, 733-34 (1971); State v. Valentine, 134 N.J. 536, 547-48, 636 A.2d 505 (1994). Second, and more significant, it was evident from defendant's uncharacteristically friendly attitude and inability to speak that he was secreting something in his mouth. And in light of all the facts and circumstances that previously gave rise to reasonable suspicion, it was reasonable for the officers to believe further that defendant was concealing evidence of illegal drug activity. We are satisfied, therefore, that probable cause existed for the official command of defendant to spit out that which he was obviously hiding. Of course, once the bag of vegetation emerged, there was even greater justification for defendant's subsequent arrest and search incident to that arrest.
However, we do not find that the fruits of that search, namely a small folded pocket-knife and $1300 in cash, gave rise to any further reasonable belief that additional drugs were hidden in other body parts to justify the intrusive invasion of a strip search. We, therefore, hold that the court below erred in denying defendant's motion to suppress the eighteen baggies of cocaine seized as a result of an illegal strip search.
In New Jersey, in addition to constitutional limitations on police searches, strip searches are regulated by statute. N.J.S.A. 2A:161A-1 to -10, which "provide[s] greater protection than is afforded by the Fourth Amendment." Hayes, supra, 327 N.J.Super. at 381, 743 A.2d 378. A "strip search" is defined as:
the removal or rearrangement of clothing for the purpose of visual inspection of the person's undergarments, buttocks, anus, genitals or breasts. The term does not include any removal or rearrangement of clothing reasonably required to render medical treatment or assistance or the removal of articles of outer-clothing such as coats, ties, belts or shoelaces.
[N.J.S.A. 2A:161A-3a.]
For persons such as defendant who are "detained or arrested for commission of an offense other than a crime," a strip search is only permitted when:
a. The search is authorized by a warrant or consent;
b. The search is based on probable cause that a weapon, controlled dangerous substance, as defined by the "Comprehensive Drug Reform Act of 1987,". . . or evidence of a crime will be found and a recognized exception to the warrant requirement exists; or
c. The person is lawfully confined in a municipal detention facility or an adult county correctional facility and the search is based on a reasonable suspicion that a weapon, controlled dangerous substance, as defined by the "Comprehensive Drug Reform Act of 1987," . . . or contraband, as defined by the Department of Corrections, will be found, and the search is authorized pursuant to regulations promulgated by the Commissioner of the Department of Corrections.
[N.J.S.A. 2A:161A-1 (Emphasis added).]
Thus, the strip search of defendant, who was arrested for the disorderly persons offense of marijuana possession, is prohibited unless supported by both probable cause and "a recognized exception to the warrant requirement." N.J.S.A. 2A:161A-1b. We need not determine whether any exigency existed because we find the threshold requirement of probable cause wanting here.
To be sure, in the probable cause determination, we examine several factors including "`the nature of the offense, the *21 arrestee's appearance and conduct, and the prior arrest record.'" Hayes, supra, 327 N.J.Super. at 380, 743 A.2d 378 (quoting Giles, supra, 746 F.2d at 617). However, there is nothing inherent in the nature of this disorderly persons offense generally, or in its commission specifically in this case, that would lead one to reasonably suspect, much less believe, that additional drugs would be secreted in other body parts. And on this score, we reject the suggestion that because defendant placed a small amount of marijuana in his mouth, he likely stashed other drugs in more intimate body cavities. We fail to see the probable nexus. See State v. Patino, 83 N.J. 1, 12, 14-15, 414 A.2d 1327 (1980) (finding that a small amount of marijuana does not alone suggest participation in drug traffic or possession of more contraband.). Indeed, despite their familiarity with defendant, there is no evidence in this record that the police knew him to have a history of concealing drugs or even ever having attempted to use drug concealment methods. On the contrary, defendant and his companion had already been patted down and no additional drugs were found on either person, or for that matter, in their immediate vicinity. In fact, having found instead only a large amount of cash, it was more reasonable for the police to have concluded that defendant had exhausted his supply for the evening and was now enjoying the fruits of the day's business. Finally, we also deem insufficient the State expert's view that drug dealers usually secrete drugs in their body parts. Such a generalized notion falls far short of specific particularized facts needed to establish probable cause and amounts to no more than a hunch or supposition.
Lacking probable cause, the State relies alternatively on the doctrine of inevitable discovery. See State v. Johnson, 120 N.J. 263, 289-90, 576 A.2d 834 (1990); State v. Sugar, 100 N.J. 214, 238, 495 A.2d 90 (1985). The State argues that the cocaine would have been inevitably discovered during a strip search incident to defendant's detention in the county or city jail upon being charged with the indictable crime of certain persons prohibited from possessing weapons. The motion judge agreed.
We conclude the contention is without merit for several reasons. Most importantly, N.J.S.A. 2A:161A-1 prohibits strip searches unless certain conditions exist, none of which pertain here. As we said in Hayes, "[t]he statute is prophylactic, designed to protect citizens from an intrusive and degrading invasion of privacy. We are persuaded that the Legislature intended that all elements justifying this invasion be in place before the search occurs." Hayes, supra, 327 N.J.Super. at 385, 743 A.2d 378. In short, there is no legislative exemption for matters of inevitable discovery.
Moreover, there is no evidence in the record that, even upon learning of defendant's prior conviction through a criminal records check, he would have been lawfully confined in a municipal detention facility, or that he would not otherwise have satisfied bail with respect to the charge of possessing a weaponi.e. a knifeby a convicted person. Even if defendant were to be lawfully confined in a municipal detention facility, there is no record evidence that he would have been subjected to a lawful strip search. In this regard, administrative regulations of the Department of Corrections mandate that a person lawfully confined who is charged with committing a crime may only be strip-searched upon the authorization of the custody staff member in charge and the existence of "reasonable suspicion to believe the person is concealing a weapon, contraband or controlled dangerous substances. . . ." N.J.A.C. 10A:34-2.17(b)(2)(iii). Here, the *22 record establishes neither. For these reasons, we find the inevitable discovery doctrine inapplicable. Therefore, we conclude it was error to deny the motion to suppress evidence seized as a result of the illegal strip search and consequently vacate the judgment of conviction on Counts I and II.

(ii)
Absent such evidence, the conviction on Count III cannot stand. It fails for yet another reason. Defendant made a timely motion for an acquittal on, among other charges, that of unlawful possession of a knife while in the course of committing a CDS crime. R. 3:18-1. The judge denied the motion. On appeal, defendant maintains there was insufficient evidence of an intent or purpose to use the knife unlawfully during the commission of the drug offense. We agree.
In reviewing whether the trial court properly denied a motion for a judgment of acquittal, we must view the State's evidence, "`in its entirety and giv[e] the State the benefit of all its favorable testimony and all of the favorable inferences' to be drawn from that testimony to determine whether a jury could find guilt beyond a reasonable doubt under the statute.'" State v. Spivey, 179 N.J. 229, 235, 844 A.2d 512 (2004) (quoting State v. Moffa, 42 N.J. 258, 263, 200 A.2d 108 (1964)) (second alteration in original). See R. 3:18-1; State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967). Here, the evidence failed to satisfy that standard.
N.J.S.A. 2C:39-4.1 provides in pertinent part:
a. Any person who has in his possession any firearm while in the course of committing, attempting to commit, or conspiring to commit a violation of [a drug offense involving distribution or intent to distribute] is guilty of a crime of the second degree.
b. Any person who has in his possession any weapon, except a firearm, with a purpose to use such weapon unlawfully against the person or property of another, while in the course of committing, attempting to commit, or conspiring to commit a violation of [a drug offense involving distribution or intent to distribute] is guilty of a crime of the second degree.
[N.J.S.A. 2C:39-4.1.]
For present purposes, the statute embraces two discrete classifications. The first is firearms, the simple possession of which in the course of committing a CDS crime is sufficient to qualify for criminal culpability. The character of the offense, therefore, is not dependent on how the firearm is used or intended to be used. Because "the rationale . . . is to deter and punish the involvement of drug dealers with firearms and the risk of violence engendered by mixing guns with illegal drug distribution," State v. Harrison, 358 N.J.Super. 578, 584, 818 A.2d 487 (App. Div.2003), aff'd sub nom. State v. Spivey 179 N.J. 229, 844 A.2d 512 (2004), "`the mere presence of guns at the scene'" where the drug offense is committed suffices. Ibid. (quoting State v. Stewart, 96 N.J. 596, 602, 477 A.2d 300 (1984)). In fact, so compelling is this rationale, that to be guilty of a violation of N.J.S.A. 2C:39-4.1a, one need not simultaneously be in actual possession of the firearm and drugs. Spivey, supra, 179 N.J. at 239-40, 844 A.2d 512 (a defendant who was detained outside his apartment building at the time drugs and handgun were found inside the apartment was in constructive possession of both and therefore committed an offense under N.J.S.A. 2C:39-4.1a).
The second classification is the more inclusive category of weapons, other *23 than firearms, simple possession of which does not establish, in and of itself, the requisite criminal liability. N.J.S.A. 2C:39-4.1b. Although "[w]e have found no legislative history . . . that explicitly addresses the required proximity between weapon[s], drugs, and perpetrator[s] . . .", Harrison, supra, 358 N.J.Super. at 584, 818 A.2d 487, clearly the Legislature established a more substantial nexus than a mere temporal and spatial link between the possession of a weapon and the drugs that a defendant intends to distribute. The focus of the charge under section (b) is on a defendant's purpose in possessing the weapon. To support a conviction under N.J.S.A. 2C:39-4.1b, a defendant must have a purpose to use the weapon, unlawfully, against a person or property of another during the commission of the underlying drug offense. The issue is not whether the possession was unlawful, but whether the purpose of the possession was illegal and existent at the time that the CDS offense took place. See State v. Parolin, 171 N.J. 223, 227, 793 A.2d 638 (2002) ("The legislative intent is to focus on the intent or purpose for the possession, rather than the possession itself."); State v. Villar, 150 N.J. 503, 510, 696 A.2d 674 (1997) ("The offenses under Chapter 39 are directed at the intent to use weapons to commit crimes, and not merely to penalize possession per se."), certif. denied, 155 N.J. 587, 715 A.2d 990 (1998).
To be sure, "the unlawful purpose or subjective intent of a defendant. . . may be inferred from the totality of the circumstances, including the use of the weapon. . . ." State v. Diaz, 144 N.J. 628, 636, 677 A.2d 1120 (1996). More specifically:
"surrounding circumstancessuch as the size, shape and condition of the knife, the nature of its concealment, the time, place and actions of the carrier when found in his possession" indicate that the purpose of carrying the knife is its use as a weapon. Those same circumstances indicate that possession of a knife may be "not manifestly appropriate" for its lawful use.
[State v. Lee, 96 N.J. 156, 162, 475 A.2d 31 (1984) (quoting State v. Green, 62 N.J. 547, 560, 303 A.2d 312 (1973)).]
See also State v. Williams, 168 N.J. 323, 340, 774 A.2d 457 (2001); State v. Blaine, 221 N.J.Super. 66, 70, 533 A.2d 980 (App. Div.1987) (where an implement is of equivocal character, which is susceptible to both lawful and unlawful uses, its status as a weapon whose possession is capable of subjecting the possessor to criminal liability is entirely dependent on the circumstances attending the possession).
In analogous cases dealing with whether mere possession of a knife, which unlike a fireman is not a per se deadly weapon, amounted to a "deadly weapon" to sustain an armed robbery conviction under N.J.S.A. 2C:11-1c, courts have answered in the negative. State v. Brown, 325 N.J.Super. 447, 739 A.2d 975 (App.Div. 1999), certif. denied, 163 N.J. 76, 747 A.2d 285 (2000); State v. Riley, 306 N.J.Super. 141, 703 A.2d 347 (App.Div.1997). In both cases, there was no evidence that the defendant used or intended to use the knife in the robbery. Brown, supra, 325 N.J.Super. at 454, 739 A.2d 975; Riley, supra, 306 N.J.Super. at 149-50, 703 A.2d 347. In Brown, the weapon was "an ordinary kitchen knife, [with] a fixed, five-inch blade, a small portion of which was protruding from [the] defendant's pocket at the time of his arrest." 325 N.J.Super. at 454, 739 A.2d 975. In Riley, the defendant had in his pocket "a three-bladed pocket folding knife, the largest blade being about four inches long." 306 N.J.Super. at 145, 703 A.2d 347. In neither case was the knife either held by the defendant or seen *24 by the victim. Brown, supra, 325 N.J.Super. at 454, 739 A.2d 975. The only evidence was that it was immediately available to the defendant during the robbery. We held in both cases that this was "not sufficient that the weapon was a `deadly weapon' as defined in N.J.S.A. 2C:11-1c" and, therefore, vacated the first-degree robbery conviction. Ibid.
The question before us now is whether the proofs here permitted the finding that defendant's "weapon" was under the circumstances used or intended to be used unlawfully in the commission of the underlying drug offense. Plainly not. As we noted in Blaine, a pocket knife of the type defendant had in his pocket, "is, in fact, an implement which is commonly and regularly sold throughout the state as a matter of ordinary commerce." Blaine, supra, 221 N.J.Super. at 70-71, 533 A.2d 980. Here, the pocket knife was small and of the folding variety, and was in fact folded. It was neither held by defendant nor seen by the police officers until removed from defendant's pants during the search. It was never used in the commission of the drug offense nor did defendant attempt to use it during the entire encounter with the police.
Nevertheless, the State argues that the pocket knife loses its innocent, innocuous character by virtue of both defendant's behavior during the strip search and its expert's suggestion that drug dealers often carry weapons for protection. We conclude no reasonable inference of unlawful purpose can be drawn from either supposition. Any force exerted by defendant was only in defensive resistance to the most intrusive and invasive of official searches and has no bearing whatsoever on his possession of the pocket knife or propensity towards violence. Moreover, the generalized notion that drug dealers possess a weapon to protect their CDS cannot support a finding that this particular defendant shared that specific intent on this particular occasion. Otherwise, if the expert's supposition is all that is required to support a contention under N.J.S.A. 2A:39-4.1b, there would be no need for the statutory scheme differentiating between possession of firearms, as a per se offense, and possession of other weapons, an offense requiring a much closer nexus by way of a purpose and specific intent. This distinction, however, is integral to the very structure of N.J.S.A. 2A:39-1. Recognizing that the latter classification may be proven entirely circumstantially, we nevertheless find no evidence of use or intended use to support defendant's conviction under N.J.S.A. 2A:39-4.1b, and, therefore, reverse the conviction.

(iii)
We proceed to address defendant's next contention because of the viability of his remaining convictions.
Defendant argues that the court should have conducted a Faretta[3] inquiry after he expressed dissatisfaction with his representation to determine whether defendant wished to represent himself and was capable of doing so. This contention is without merit.
On the first day of trial, defense counsel advised the court that defendant was seeking new counsel and wanted an adjournment:
[ATTORNEY FOR DEFENDANT]: Judge, the only other issue remaining is [defendant] has advised me that he is in the process of retaining private counsel in this matter and is requesting an adjournment. I explained to him, Judge, that today's the scheduled trial date, *25 that Your Honor would probably not be inclined to do so, but I am making an application on behalf of [defendant] that this matter be given another date in order to afford [defendant] additional time to retain counsel.
THE COURT: All right. It sometimes happens that folks are not satisfied with the representation that they have, particularly the day of trial. In order for a new attorney to come in, not only would the person have to be present today, which no one is present, they would actually have to file a formal application in order to be allowed to enter the case at this late date. And, frankly, I would expect anyone who did enter the case to be able to pick up the trial.
[DEFENDANT]: Well, mywith a the attorney that I got isalready took my discovery, always went over my case like last week. I do believe the my mom said that they calledshe called up here or whatever. I don't know. I mean I ain't really talked to her yet. But I do got it. I do got the attorney though. . . .
THE COURT: Okay. This is the problem. . . . Once a matter is scheduled for trialAnd I don't know how long ago this matter was.in order for someone new to represent you, they actually have to ask for permission, because the fact a person decides to change horses midstream is not supposed to delay the case.
Jury selection began immediately following the colloquy. The next day, after the State's case was completed, defendant waived his presence and walked out of the courtroom when the judge properly advised him that he could not testify in front of the jury about his dissatisfaction with his attorney. Defendant now complains that the court erred in failing to hold a hearing and present him with the option of proceeding pro se.
It is clear that pursuant to the Sixth Amendment a defendant can "represent himself in criminal proceedings." State v. Gallagher, 274 N.J.Super. 285, 294, 644 A.2d 103 (App.Div.1994) (citing Faretta, supra, 422 U.S. at 821, 95 S.Ct. at 2534, 45 L.Ed.2d at 574). Moreover, the State has no constitutional authority to "impose a lawyer upon an unwilling defendant" because the defendant holds the personal "right to defend," and "the defendant, not his lawyer . . . bear[s] the consequences of a conviction." Id. at 295, 644 A.2d 103.
The right to self-representation, however, is not absolute. A defendant must "`voluntarily and intelligently'" elect to conduct his own defense. Martinez v. Court of Appeal of Cal., Fourth Appellate Dist., 528 U.S. 152, 161-62, 120 S.Ct. 684, 691, 145 L.Ed.2d 597, 607 (2000) (quoting Faretta, supra, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581). In this regard, the "right of self-representation does not attach until asserted." Brown v. Wainwright, 665 F.2d 607, 610 (5th Cir.1982); see also Williams v. Bartlett, 44 F.3d 95, 100 (2nd Cir.1994) ("In order to waive one's right to counsel, there must be an initial request to proceed pro se."). The request to proceed pro se must be made "clearly and unequivocally." Faretta, supra, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. See also Buhl v. Cooksey, 233 F.3d 783, 790 (3d Cir.2000). Moreover, the request for self-representation must be made "in a timely manner." Martinez, supra, 528 U.S. at 162, 120 S.Ct. at 691, 145 L.Ed.2d at 607; see also State v. Roth, 289 N.J.Super. 152, 165, 673 A.2d 285 (App.Div.), certif. denied, 146 N.J. 68, 679 A.2d 655 (1996) ("A defendant who desires to exercise his right to proceed pro se must do so with reasonable diligence."); compare State v. Thomas, 362 N.J.Super. 229, 240, 827 A.2d 1087 (App.Div.) (finding *26 that the "[d]efendant's assertion of his right to self-representation was timely made, about six weeks prior to trial"), certif. denied, 178 N.J. 249, 837 A.2d 1092 (2003); with State v. Pessolano, 343 N.J.Super. 464, 473, 778 A.2d 1153 (App. Div.), certif. denied, 170 N.J. 210, 785 A.2d 438 (2001) (finding that trial judge did not abuse his discretion in denying "defendant's application to proceed pro se [when it] was made after the jury was selected and immediately before opening statements").
The right to counsel is in force until waived. Wainwright, supra, 665 F.2d at 610. Given the corollary loss of a defendant's right to counsel, "the courts `indulge [in] every reasonable presumption against the waiver' of this constitutional right [to counsel.]" Gallagher, supra, 274 N.J.Super. at 295, 644 A.2d 103 (quoting State v. Guerin, 208 N.J.Super. 527, 533, 506 A.2d 743 (App.Div.1986)) (first alteration in original); State v. Wiggins, 291 N.J.Super. 441, 450, 677 A.2d 800 (App. Div.), certif. denied, 146 N.J. 568, 683 A.2d 1163 (1996). It is only after a party clearly and unequivocally asserts his or her right to proceed pro se and renounces the right to counsel that the court undertakes an investigation, the goal of which is to determine the adequacy of the waiver. As Justice Black explained:
To be valid such waiver [of trial counsel] must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.
[Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309, 321 (1948) (plurality opinion).]
As a result of this mandate, we "require[] trial judges to engage in a searching inquiry with defendants seeking to proceed pro se." State v. Crisafi, 128 N.J. 499, 510, 608 A.2d 317 (1992). After the court conducts its "searching and painstaking inquiry," and determines that defendant's election to proceed pro se was "knowing and intelligent," defendant cannot "be forced to accept the services of an attorney." Gallagher, supra, 274 N.J.Super. at 296, 644 A.2d 103. This choice "must be honored," regardless of whether defendant made a poor choice and is subsequently convicted. Ibid.
Of course, there is a difference, constitution-wise, between the right of self-representation and the right of a defendant to secure counsel of his own choice. The latter is not absolute "and `cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice and deprive such courts of the exercise of their inherent powers to control the same.'" State v. Furguson, 198 N.J.Super. 395, 401, 487 A.2d 730 (App.Div.), certif. denied, 101 N.J. 266, 501 A.2d 933 (1985) (internal citation omitted); State v. McLaughlin, 310 N.J.Super. 242, 258, 708 A.2d 716 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998); see also Crisafi, supra, 128 N.J. at 517, 608 A.2d 317 ("A defendant does not enjoy an unencumbered right to counsel of his or her choice."); State v. Ortisi, 308 N.J.Super. 573, 588, 706 A.2d 300 (App.Div.), certif. denied, 156 N.J. 383, 718 A.2d 1212 (1998). "Disagreement over defense strategy, however, does not rise to the level of good cause." Crisafi, supra, 128 N.J. at *27 518, 608 A.2d 317; see also Ortisi, supra, 308 N.J.Super. at 588, 706 A.2d 300.
Moreover, "a court may not require the Public Defender to assign new counsel to a defendant who was dissatisfied with the attorney assigned to represent him, absent a showing of `substantial cause.'" State v. Coon, 314 N.J.Super. 426, 438, 715 A.2d 326 (App.Div.) (quoting State v. Lowery, 49 N.J. 476, 489-90, 231 A.2d 361 (1967)), certif. denied, 157 N.J. 543, 724 A.2d 802 (1998). As we noted in Coon, "the constitution does not guarantee that counsel appointed for a defendant shall measure up to his notions of ability or competency." Ibid. In other words, "a defendant does not have the right to accept or reject assigned counsel, as whim or scheme dictates." Ibid.; see also State v. Wiggins, 158 N.J.Super. 27, 34, 385 A.2d 318 (App.Div.1978). And, as with the election to proceed pro se, a defendant must act "`with reasonable diligence'" when exercising "`the right to choose his [or her] own counsel.'" State v. Kordower, 229 N.J.Super. 566, 576, 552 A.2d 218 (App.Div.1989) (quoting State v. McCombs, 171 N.J.Super. 161, 165, 408 A.2d 434 (App.Div.1978), aff'd, 81 N.J. 373, 408 A.2d 425 (1979)).
Measured by these governing principles, we discern no violation of defendant's Sixth Amendment right to counsel. Most significantly, the record is barren of any expressed desiremuch less a clear and unequivocal oneon defendant's part to proceed without counsel and to represent himself. Therefore, the court was under no obligation to affirmatively suggest the option or hold a hearing into the voluntary and knowing character of a waiver never even expressed. It is equally clear that by simply voicing his dissatisfaction with counsel immediately at the start of trial, defendant failed to act expediously in seeking counsel of his choice, to offer any excuse for his much belated request, or to proffer a valid basis to disrupt a trial in progress. As we noted in State v. Slattery, 239 N.J.Super. 534, 542, 571 A.2d 1314 (App.Div.1990), "[a] defendant cannot be permitted to play a `cat and mouse' game, thereby placing the trial judge in a position where, in managing the business of the court, he appears to be arbitrarily depriving the accused of counsel." (quoting United States ex rel. Davis v. McMann, 386 F.2d 611, 618-19 (2d Cir.1967), cert. denied, 390 U.S. 958, 88 S.Ct. 1049, 19 L.Ed.2d 1153 (1968)). Under the circumstances, defendant suffered no violation of his Sixth Amendment right to counsel.

(IV)
In light of our disposition, we need not address defendant's remaining contentions regarding his sentence.
We reverse the convictions of third-degree possession of a CDS with intent to distribute (Count I), second-degree possession of a CDS with intent to distribute within 500 feet of public property (Count II), and second-degree unlawful possession of a weapon while in the course of committing a CDS crime (Count III). In all other respects, the judgment of conviction is affirmed.
NOTES
[1] The latter offense was severed and tried by the court.
[2] In fact, defendant had a prior 1998 conviction for distribution of drugs, which supported his present conviction of fourth-degree possession of a weapon, a knife, by a previously convicted person.
[3] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).