STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JASPER LOWERY, DEFENDANT-APPELLANT.

Argued April 10, 1967—Decided July 5, 1967.

*Mr. Bruce D. Shoulson* argued the cause for defendant-appellant.

*Mr. James R. Zazzali,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J. The Essex County Grand Jury returned an indictment against the defendant Jasper Lowery charging that on April 14, 1965 he willfully, feloniously and of his malice aforethought murdered Thomas Bennett. More particularly, the State claimed that Bennett was killed by a shotgun blast fired by Lowery from a front window of his third floor flat at 123 Sherman Avenue, Newark, N. J. After the trial, which concluded on March 30, 1966, a jury found him guilty of murder in the second degree, whereupon the trial court sentenced him to fifteen to twenty years in New Jersey State Prison. Lowery then appealed directly to this Court under *R. R.* 1:2–1(c), alleging a number of trial errors as grounds for reversal of the conviction.

There was very little dispute at the trial about the basic facts of the homicide. The verdict of second degree murder was clearly justified; actually one of first degree would have been within the boundaries of the proof. On this appeal defendant does not complain that the determination of the jury is contrary to the weight of the evidence. Under the circumstances, detailed discussion of facts is not necessary; a general outline seems sufficient.

Defendant Lowery was 48 years of age at the time of the fatal shooting. He had been living at 123 Sherman Avenue, Newark, N. J. with his wife, 18-year-old daughter and a son 17 months old, for about eight months on April 14, 1965. The building is a three story frame tenement with a front stoop facing Sherman Avenue. Alfred C. Miller and his family occupied the first floor, the second floor was unoccupied, and Lowery was the third floor tenant. The neighborhood was described by police officers as a trouble area.

On April 14, 1965 between 9 and 10 P. M., Miller, his wife and two children returned home. On arrival they found five persons, four men and a young woman, sitting on the steps of the front stoop. They had been drinking. Miller asked them to move so he and his family could enter. Four of them did so; one refused profanely and told Miller to "move" him. He was Thomas Bennett, 20 years of age, who was later shot by Lowery. Miller took up the challenge and the two men tussled briefly before other persons intervened. During the encounter the front door glass was broken and one of Miller's legs sustained a gash. When the encounter ended, Bennett threatened Miller, saying, "I am going to get you. I am going to kill you." One of the other members of Bennett's group was encouraging him to "get" Miller. The Millers went into their apartment and a few minutes later a bottle was thrown through one of the front windows. Mrs. Miller then called the police, who responded in a short time, but the rowdy group had disappeared. The police departed after promising to check again in an hour.

Lowery was neither present nor in any way involved in the fracas. He was in his third floor apartment at the time with his wife and children. He was aware of the five persons on the front stoop drinking wine, and on hearing the altercation he looked out the window and saw the scuffle between Miller and Bennett. When the police arrived he called out to them the direction in which the young men had run. According to Miller, Lowery came downstairs and asked if he needed any help. Miller had to report for work at 11 P. M. and requested Lowery to keep an eye on his family. Lowery testified that a little later he saw the "gang" gathering again, so he went downstairs and asked Mrs. Miller if she wished to come up to his apartment with her children; she declined. He started back upstairs and, remembering he was out of cigarettes, called up to his wife that he was going out to get some. As he went out the front door, he said, two of the men, who were near a Miller front window, shouted something unpleasant at him, which indicated they thought he was Miller. At this time there were other men across the street also. He turned back into the house as some bottles were thrown.

Some inconsistency appears in the testimony at this point. Mrs. Miller, who obviously was kindly disposed toward Lowery, testified that after he left her she heard his footsteps going upstairs and 30–40 seconds later heard a shot. She testified also that, just after Lowery left her flat, she heard someone say "I am going to kill you. I am going to get you." Whether Lowery or someone else made the statement, she did not know. Her husband also testified that as he left for work, someone said "We'll burn him out." Another witness for the State, a cousin of Bennett, asserted that he passed the stoop about a half-hour before the shooting, and heard Lowery, who was on the stoop, say to an unidentified person, "If he'll come back, I will shoot him." In any event Lowery said he went up to his apartment, took out a 12 gauge shotgun, which he had had for some years, and loaded it. He was an experienced hunter, and held a New Jersey hunting license.

The sequence of events after the loading of the shotgun is in conflict. Lowery testified that he went down to the front door with the gun hoping to frighten the young men away. He said he had no intention of shooting anyone. As he opened the front door, stepped out and said something to the men, a bottle or bottles were thrown at him. He raised his arms or ducked to avoid being hit and the shotgun went off. He ran back upstairs to his apartment, looked out the window and saw a man across the street on his knees. Then, at his request, his wife called the police. Before the police arrived, he disassembled the gun, returned it to the case and put it under the mattress of a daybed.

When the officers appeared they found the body of Bennett lying in a pool of blood on the Sherman Avenue sidewalk diagonally across the street from 123 Sherman Avenue, Lowery's apartment. The distance from his third story front window to the point across the street where the body was found was 76 feet, 2 inches. There was no blood in front of Lowery's house, nor any trail of it across the street to where Bennett lay. The county physician found seven severe shotgun wounds in Bennett from the head downward, and expressed the opinion that when hit the victim "fell down like a ton of bricks," and death was "almost instantaneous." The doctor testified also that the angle at which the pellets went into the body indicated that the shot was fired from above, downward at a 40–45 degree angle.

Two Newark detectives, Freid and Bostic, who came to the scene at about 10:40 P. M., took up an immediate investigation of the area. Freid found a shotgun shell casing in front of 123 Sherman Avenue, about one foot in from the curb. On entering the building he spoke to Mrs. Miller and then he and Bostic proceeded to the third floor to see Lowery, whom Freid knew. Lowery appeared upset and perspiring, and on inquiry admitted owning a shotgun but denied knowing anything about the shooting. The gun was soon found disassembled under the daybed mattress. Freid said the barrel was still warm, indicating, he told Lowery, that it had been fired a

very short time earlier. Lowery then said he had gone out to tell the boys to get off the stoop. Bennett came into the hallway after him and was about to throw a bottle at him when he fired the gun. At this time Bennett was at the first floor level and Lowery was either on the stairway between the first and second floors or had reached the second floor landing.

The detectives found no shotgun pellet marks or blood in the hallway or any blood in front of the building or in the street between the building and the place across the street on the sidewalk where the body was lying. When these facts were brought to Lowery's attention, he changed his story and said the person shot was in the street. Lowery was brought to police headquarters and agreed to give a statement, which was begun about an hour after the officers arrived at the scene of the shooting. This statement added another version of the shooting incident. In it Lowery said that when he opened the front door of his building to go out for cigarettes, Bennett threw a bottle at him, breaking the storm door. Then he threw a bottle or a brick through the Miller front window, and started after Lowery with a knife in his hand. Lowery ran upstairs, into his apartment and came out again carrying the gun. Bennett was in the first floor hallway cursing. When Lowery was on the stairway between the second and first floors, Bennett "started" at him again with the knife in one hand and a bottle in the other. He threw the bottle at Lowery, who fired his gun wanting "to shoot over his head" but, in attempting to duck the bottle, hit Bennett. He "didn't mean to shoot" Bennett, whom he did not know at all. (The police found no knife on or near the body.)

The State produced two witnesses to the shooting. One, Willie Stewart, a cousin of the victim, and the other a friend, Robert Thompson. From their testimony it appeared that, after the fracas involving Miller, Bennett and others (including Stewart and Thompson) went to a nearby restaurant. Thereafter Bennett left with one Phillips (who did not testify), and Stewart followed with Thompson. According to Stewart, when Bennett reached the corner of Miller Street

and Sherman Avenue Stewart heard a shot and saw Bennett, who was facing 123 Sherman Avenue, collapse on the sidewalk. Looking toward that building, Stewart saw smoke between the second and third floors.

Thompson's version was somewhat different. When he came out of the restaurant he saw Bennett sitting on the rear of a parked car. He heard someone cry "watch out," at which Bennett jumped up, faced toward 123 Sherman Avenue, and was shot. This witness also saw smoke between the second and third floors of defendant's building.

The State also produced a ballistics expert to test-fire Lowery's shotgun. On the basis of his tests, it was his opinion that the decedent was shot from a distance of about 75 feet.

At the trial, Lowery's credibility was sharply attacked by the State as to the precise circumstances which attended the shooting. As has been indicated, his testimony and his on-the-scene oral statement to the investigating police, as well as his signed statement at police headquarters, were in conflict as to the situation which existed immediately before and at the time of the firing of the gun. Also in question by the State was his testimonial assertion that his action in obtaining his gun, loading and firing it were prompted only by fear for his wife and children, should the building be set on fire. In this connection, although his wife and 18-year-old daughter were in the apartment when the shooting occurred and when he had the conversation with the investigating officers after the shooting, neither the wife nor the daughter appeared as witnesses in Lowery's defense at the trial. The prosecutor's comment in summation about defendant's failure to produce his wife is one of the alleged trial errors. It will be discussed hereafter. Moreover, on the issue of credibility the State showed on cross-examination of defendant that he had been convicted previously of larceny, of malicious injury to property, twice for assault and battery with a deadly weapon, and of manslaughter.

■ At the trial the defense claimed the killing was by misadventure, or in the alternative, that it was justified as self-

defense or defense of Lowery's family, or to prevent the burning of his home. The State claimed the killing was first degree murder. After a comprehensive charge by the court, the jury resolved the issues by a verdict of second degree murder. As indicated at the outset, in our judgment the evidence was ample to sustain the jury determination.

I.

Defendant seeks a reversal of the conviction on the ground that prejudicial error was committed by the prosecutor when in his summation he questioned why Mrs. Lowery had not testified in her husband's defense, and also commented that from her non-appearance as a witness the jury could understand that if she had testified she would have "hurt" the defendant. There was no objection by defendant to the prosecutor's argument, but it is presented on this appeal as plain error, *i. e.*, "legal impropriety affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Corby*, 28 *N. J.* 106, 108 (1958). We find no such error here.

Defendant relies principally on Rules 23 and 39 of the 1960 Evidence Act, *L.* 1960, *c.* 52 §§ 17, 31; *N. J. S.* 2A:84A–17, 31. Rule 23 provides that the spouse of an accused in a criminal action shall not testify except to prove the fact of marriage, unless the accused and the spouse "shall both consent." And Rule 39 says that if the privilege not to testify or not to prevent another from testifying is "exercised," neither the judge nor counsel "may * * * comment thereon," and "no presumption shall arise with respect to the exercise of the privilege, and the trier of fact may not draw any adverse inference therefrom." The Rule goes on to provide that, in cases where exercise of the privilege "may be misunderstood and unfavorable inferences drawn by the trier of the fact, * * * at the request of the party exercising the privilege,"

the court "may instruct the jury in support of such privilege." The defense made no request for such an instruction in this case, even after the prosecutor's comment in summation. In the context of the trial, and particularly in view of the many references by defense counsel to the intended production of the wife as a witness, it is fairly inferable that as a matter of trial tactics it was considered inadvisable either to object to the prosecutor's comment or to request the charge authorized by Rule 39.

The record shows that on at least five occasions during the selection of jurors defense counsel indicated he would call Mrs. Lowery as a witness. In his opening to the jury, while describing the shooting event, he said Lowery did not know if he had shot anyone "but his wife will tell you that he said: 'I think I hit a man.' * * *" At one point during the trial, in opposing the prosecutor's request to the court to exclude defendant's infant child from the courtroom because it was a disturbing influence, defense counsel said:

"I would not object to the child being in an inconspicuous place farther back, but now that I think it over, I *most definitely intend to introduce the wife and child who were in the apartment* and the jury has a right to see that there was actually a family there being defended, so why exclude them at another time *when they are going to be presented* anyway, sooner or later?" (Emphasis added)

Finally, in summation defense counsel called to the attention of the jury the fact that some of the police officers who had knowledge of some facts had not testified. He proceeded:

"* * * and I am not saying that they should have been called. There were other fellows in the crowd, for example, Gary Marble. We do not even know if he was available to testify but we know he was there and some other fellows. We do not know what they may have testified to, and the *same on the defense side*. I am trying to be frank here.

There were other members of Mr. Lowery's family who might have testified. You do not know what they may have said. * * * You can consider that on both sides there may have been testimony that would *have hurt that side or helped that side* and was not produced. *That may form some slight part of your consideration legally* * * *." (Emphasis added)

We do not regard it as necessary for a husband or wife to go upon the stand and there affirmatively "exercise" the privilege not to testify. The decision of a husband in a case like the present one not to call his wife as a witness is a sufficient "exercise" of the privilege to justify invocation of the statutory protection. Compare, *State v. Anderson,* 35 *N. J.* 472, 487–488 (1961). The State refers us to *State v. DePaola,* 5 *N. J.* 1, 20 (1950), where this Court sanctioned such comment as the prosecutor made here. With the advent of Rule 39 in 1960, however, *DePaola* can no longer be considered the law. Although the precise question was not raised in *State v. Anderson,* the language of the Court leaves no other implication. 35 *N. J.,* at *p.* 488.

■ But the defendant cannot lean on the statute here. He certainly gave every indication in the course of the trial that he intended to call Mrs. Lowery. Then he sought in his own summation to minimize possible adverse inferences from the failure to do so, at the same time recognizing that the jury could give consideration to the failure. Such argument invited the prosecutor's comment, which cannot be regarded as prejudicial error under the circumstances. See, *Mash v. People,* 220 *Ill.* 86, 77 *N. E.* 92, 94 (1906) ; *State v. Schultz,* 46 *N. J.* 254, 259, *certiorari* denied 384 *U. S.* 918, 86 *S. Ct.* 1367, 16 *L. Ed.* 2d 439 (1966) ; *State v. Fioravanti,* 46 *N. J.* 109 (1965), *certiorari* denied 384 *U. S.* 919, 86 *S. Ct.* 1367, 16 *L. Ed.* 2d 440 (1966).

## II

Defendant claims that his oral admissions to the detectives made at home with his wife and daughter in the apartment at the time, within a relatively few minutes after the shooting and in the beginning stages of the police investigation, should not have been admitted in evidence. He asserts also that it was improper to permit his written statement to be introduced.

When the prosecutor indicated he was about to offer defendant's oral admissions, the court excused the jury and

conducted a preliminary hearing in accordance with the procedure outlined in *State v. (Clarence) Smith*, 32 *N. J.* 501, 559–560 (1960), *certiorari* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961); *State v. Jackson*, 43 *N. J.* 148, 166–167 (1964); *State v. Sullivan*, 43 *N. J.* 209, 224, 226 (1964), *certiorari* denied 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed. 2d* 477 (1966).

The State produced the two detectives to whom on-the-scene and before-arrest oral admissions were made by defendant. They described the circumstances under which they interviewed defendant and demonstrated clearly that there was no physical or mental coercion or duress imposed on Lowery. Defendant claimed no violence or coercion, and did not take the stand to suggest any involuntariness in connection with his statements to them. His attorney's only criticism was that the officers had not advised him of his right to silence and to an attorney before they began to talk to him. The trial court found the admissions were made voluntarily and admitted them.

The written statement given by defendant at police headquarters after his arrest was not introduced in the State's main case. During the defense, however, when defendant was on the witness stand under cross-examination, the prosecutor undertook to use it to attack his credibility. Again the court excused the jury and held a preliminary hearing as to its voluntariness.

The officers who took the statement were then called. They testified they advised Lowery that he did not have to make any statement, that anything he said may be used against him, and that he had the right to consult an attorney before making any statement. This warning appeared also as a separate preamble to the statement that was given. Lowery was practically illiterate, being able to do little more than sign his name. For that reason the preamble was read to him, and he said he understood it. He said he did not wish a lawyer, that he was willing to give a statement, and he affixed his signature to the preamble. All of this took place within about

an hour of the shooting. Then he proceeded to recount the version of the affair as outlined above. At its conclusion, the statement was read to him; he said he understood it; there were no changes he desired to make, and it was the truth. After this he signed the statement.

Lowery testified on this hearing. He made no claim of abuse or physical violence, or that any threats or promises were made by the officers. But he claimed he was not advised of his constitutional rights; the preamble was not read to him; he was simply told to sign it and tell the officers how the shooting happened. He denied he was told of his right to counsel, and conceded he did not ask for an attorney, although he had had an attorney in his earlier manslaughter case. He admitted his statement was read to him upon its completion, but alleged he did not understand what was read to him. At the conclusion of the hearing the trial court found that the statement was voluntarily made, detailed its reasons for the finding, and allowed it to be used by the State. The proof in its totality adequately supports the view that the State fully discharged its affirmative burden of showing that none of the admissions, oral or written, trespassed upon Lowery's constitutional rights. *State v. Coleman,* 46 *N. J.* 16, 30–34 (1965); *State v. Billingsley,* 46 *N. J.* 219, 234–236 (1966); *State v. Taylor,* 46 *N. J.* 316, 326–329, *certiorari* denied 385 *U. S.* 855, 87 *S. Ct.* 103, 17 *L. Ed. 2d* 83 (1966).

We have not deemed it necessary to set forth a precise resumé of all of the evidence having to do with the voluntariness of the admissions and statements because of the limited nature of the charge of error on this appeal. Defendant contends that his statements should have been excluded because they were made under circumstances which violated the rule of *Miranda v. State of Arizona,* 384 *U. S.* 436, 16 *L. Ed. 2d* 694 (1966). As has become well-known, *Miranda* holds that a defendant in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot

afford an attorney one will be appointed for him prior to any questioning if he so desires * * *." 86 *S. Ct.,* at *p.* 1630, 16 *L. Ed. 2d,* at *p.* 726.

■ We need not discuss whether the at-home questioning of Lowery immediately after the shooting and during the investigative phase of the police activity constituted such a coercive atmosphere as would make *Miranda* applicable. See, *State v. Rudd,* 49 *N. J.* 310 (1967). The murder indictment in this case was returned on April 14, 1965; the trial ended with the verdict of second degree murder on March 30, 1966. *Miranda* was decided on June 13, 1966. In *Johnson v. State of New Jersey,* 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed. 2d* 882 (1966), the United States Supreme Court held that *Miranda* need not be applied retroactively, *i. e.* to cases tried before June 13, 1966. 86 *S. Ct.* 1772, 16 *L. Ed. 2d,* at *pp.* 891–892. In *State v. Rudd, supra,* this Court declined to apply the rule retroactively, saying "[w]e are neither obliged nor disposed [to do so] to trials completed or under way before the Supreme Court's opinion was handed down." See to the same effect *State v. Boynes,* 49 *N. J.* 303 (1967). *Rudd* and *Boynes* are dispositive of defendant's contention in this case.

### III

Defendant argues that the trial court erred in not recognizing his request to dismiss his attorney and to appoint a new one.

■ After the trial had begun and during the selection of the jury, defense counsel (who had been retained privately by defendant) sought permission to withdraw from the case. Defendant joined in the request. Counsel told the court his advice was not being followed and he felt that his effectiveness had been diminished. It being the general policy of our courts not to relieve competent counsel after commencement of a trial in the absence of a showing of substantial cause, the request was denied. *State v. (Edgar) Smith,* 43 *N. J.* 67, 72–73 (1964), *certiorari* denied 379 *U. S.* 1005, 85 *S. Ct.* 731, 13

*L. Ed. 2d* 706 (1965). The nature of the differences between defendant and counsel was not made clear. Apparently the differences were resolved during the day, because at recess time defense counsel gave the trial judge a copy of a letter addressed to the assignment judge and already delivered to him. In the letter counsel pointed out that he had been privately retained but had not been paid, and that because of defendant's confinement in jail since arrest, it was plain that he was indigent and incapable of paying for legal services. Counsel further advised that the personal ethical problem which had motivated his application to be relieved had been resolved, and the defendant had "pleaded with [him] to stay on the case." Therefore, since he had devoted so much time to the study and preparation of the case, he wished to continue, and asked that he be assigned as counsel to handle the matter.

The following morning when the trial resumed, the trial judge noted receipt of the copy of defense attorney's letter, and said he wished to read it in open court in the presence of defendant. This was done and no objection was made by defendant. The trial then continued.

■ Present counsel, assigned to present this appeal, contends that defendant suffered loss of his constitutional right to an attorney because of the failure to dismiss trial counsel and appoint another. Not a single criticism is made of trial counsel's conduct of the defense or of his competence. Our own examination of the record satisfies us that the case was tried with thoroughness and competence. Under the circumstances we see no abuse of the trial judge's discretion in declining to relieve counsel.

## IV

The additional grounds for reversal presented in defendant's brief have been examined. We see no merit in any of them.

## V

For the reasons stated, the judgment of conviction is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN — 7.

*For reversal* — None.