# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2520-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KEVIN L. BETHEA,

     Defendant-Appellant.

_____

> Argued May 15, 2025 – Decided May 22, 2025
>
> Before Judges Mawla, Natali, and Walcott-Henderson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-11-1326.
>
> Lucas B. Slevin, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Lucas B. Slevin, of counsel and on the briefs).
>
> Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the brief).

PER CURIAM

Defendant Kevin L. Bethea appeals from the denial of his motion for new counsel and from his convictions and sentence for: second-degree attempted sexual assault, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2(c)(1); two counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(a) and (b); criminal restraint, N.J.S.A. 2C:13-2(a); and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). We vacate, reverse, and remand for the reasons expressed in this opinion.

The victim was fifty-seven years old at the time of trial and had two adult sons. In 2016, she was living by herself in Carteret. She testified she had known defendant, whom she identified at trial, "pretty well, for over [forty] years." They dated when she was sixteen years old for approximately one year, before defendant left for college. The two kept in touch over the years and were in contact "[q]uite often."

Approximately three weeks before the underlying incident, the victim contacted defendant via Facebook and asked if he would be interested in painting and installing flooring in her home. Defendant agreed. On September 17, 2016, she picked defendant up at the train station and brought him to her house to paint. They went to a hardware store to purchase the paint and later went out to eat. Defendant did not finish painting that day, and they decided he

would spend the night in the victim's home. The victim slept in her upstairs bedroom, while defendant slept on the lower level.

The following day, defendant woke up to finish painting but ran out of paint and told the victim he would return to finish another day. She agreed because she had to go to work, and she dropped defendant off at the train station and told him she would call him to let him know when he could return.

Defendant texted the victim on the train ride home as follows: "[T]here[] seems to be some related tension between us, and I would like to know why." The victim responded "there's no tension on my part. I'm not sure what you're talking about." Defendant texted "there seems to be some I think sexual tension[] between us." The victim responded "well that's not me. I don't . . . see it that way. I see a friend—as being friends." The following day defendant texted and "apologized for the inappropriate language that he used," and "hope[d] [she would] accept his apology." The victim replied, "you're fine."

On September 30, 2016, defendant, unannounced, came to the victim's home at 1:00 p.m. When she asked him why he was there, he claimed it was to finish the work. She agreed to let him in but informed him he would not be able to finish because she had not purchased paint. Defendant asked if he could have a drink because he was "stressed out" and proceeded to make a drink for himself.

The victim did not have a drink. Defendant then sat on a couch while the victim sat on a chair. Then he told her, "I keep telling you that I'm stressed out, but you're not listening to me."

The victim telephoned her son. During her call, defendant went upstairs, which she assumed was for purposes of surveying the work he needed to complete. While she was on the phone, she followed defendant upstairs and found him in the bedroom inspecting a window area he was painting. He then sat on a bench near the window, while she sat on the edge of the bed talking to her son. After the victim completed the call, she called her father. Defendant remarked she was making many phone calls, and the victim replied, "I'm taking care of my business, . . . I don't mean to bother you."

At that point, defendant walked over to her and "said, well that's not why I'm really here. Let me tell you why I'm really here." Defendant then said, "I [came] to take my pu**y." The victim asked defendant to move and he responded "no, I'm serious. I've come to take my pu**y." He then threw her onto the bed and attempted to remove her pants, and she told him to stop. He did not stop, and at some point, he straddled the victim's legs and spread them. Defendant unbuckled his belt, and the victim began screaming. He covered her mouth with his left hand and said "[i]f you keep screaming—I swear I'll kill you

up here. Stop screaming. I don't want to hurt you." The victim kept screaming and attempting to get away. She begged defendant to stop. Instead, he touched her breasts over her shirt and "was kissing all over [her] neck . . . saying I told you in my text that I needed you. I keep telling you I need you. I keep telling you I want you."

To escape, the victim asked defendant if he could stop to let her retrieve a condom from another room, but he refused and kept kissing her. She then said she needed to use the bathroom. Defendant agreed but told her "you better not try [any]thing." The victim ran downstairs to escape from the home, but defendant ran behind her and caught her at the door. She testified "[h]e pulled [her] by [her] hair and told [her] to get back and made [her] go sit in the kitchen in this little chair by the table." Defendant "said stop screaming or I'm going to kill you here and I don't want to hurt you." The victim continued to scream. Defendant hit her nose, grazing her.

Defendant then told the victim he was going to smoke, but warned her if she "move[d], he's going to catch . . . and kill [her]." Once defendant went outside to smoke, the victim texted her son to call the police to her home and texted her father to get to her house.

Defendant returned and sat at the kitchen table. He asked the victim who she was texting and she claimed she was sending her niece wedding congratulations. Defendant then looked at the victim's face and said "[l]ook[,] . . . you made me hurt you." He said "come on" but she refused to move. Defendant then told her, "we can do this the easy way, or we can do this the hard way." The victim refused to budge and as defendant stood up to approach her, the police entered the home.

Sergeant Douglas Greenberg of the Borough of Carteret Police Department testified he responded to the victim's residence for a sexual assault in progress. He drew his weapon and entered the residence. In the kitchen he "saw a female sitting at the kitchen table. And a [male] standing at the adjacent end of the table." The sergeant recalled the kitchen was "quite dark." He "pointed [his] service weapon at the male and ordered him to the ground," then arrested him. At trial, Sergeant Greenberg identified defendant as the man he arrested.

Once the sergeant secured the scene, the victim ran to the rear of the house crying. The victim attempted to tell police what happened but was too upset. She "didn't tell [the police] in detail what happened" and "was [just] trying to tell them a little bit." The victim could not recall what she told them and

6

admitted that when they asked her if she and defendant had a relationship, she had said no, but she "didn't think about when [she and defendant] were [sixteen] and [seventeen]." However, she told police at the scene that she and defendant were "friends." She also declined medical treatment at the scene and did not seek a restraining order.

The victim and defendant were brought to the police station. She gave the police a formal statement and investigators took photos of her face showing a cut to her nose. Defendant also gave a statement to police.

Defendant did not testify at trial, but attempted to call Detective David Zavistoski, who was involved in the State's preparation of the case for trial. During the pre-trial preparation, the victim said defendant had punched her in the face, giving her a black eye, an injured lip, and a cut on her eye. The judge denied defendant's request because the victim had not been confronted with this information as a prior inconsistent statement during her testimony. Admitting this statement through the detective would constitute hearsay.

As a result, the defense called no witnesses. The jury subsequently convicted defendant.

The trial judge granted the State's motion for an extended-term sentence. She sentenced defendant to: twenty years' imprisonment on the second-degree

attempted sexual assault conviction along with parole supervision for life, into which she merged the third-degree criminal restraint conviction; a concurrent sentence of five years for the third-degree terroristic threats conviction under N.J.S.A. 2C:12-3(b) into which the other third-degree terroristic threats conviction under N.J.S.A. 2C:12-3(a) was merged; and an eighteen-month concurrent sentence on the fourth-degree criminal sexual contact conviction.

Defendant raises the following points on appeal:

POINT I

DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO COUNSEL WHEN THE COURT ARBITRARILY DENIED HIS REQUEST FOR A NEW DEFENSE ATTORNEY WITHOUT CONDUCTING ANY INQUIRY.

> A.  Because there was good cause supporting the appointment of a new public defender, the court's failure to conduct any inquiry as to [d]efendant's request for new counsel constituted reversible error.

> B.  Because application of the Furguson[1] factors required an adjournment for [d]efendant to obtain retained counsel, the court's failure to conduct any inquiry as to [d]efendant's request for new counsel constituted reversible error.

> C.   The prosecutor's improper summation compounded the prejudice to [d]efendant by

---

[1]  State v. Furguson, 198 N.J. Super. 395 (App. Div. 1985).

8                                                         A-2520-22

incorrectly implying that [d]efendant bore the burden of proof.

POINT II

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY TO EXERCISE CAUTION IN EVALUATING ORAL STATEMENTS ALLEGEDLY MADE BY DEFENDANT. (Not Raised Below).

POINT III

DEFENDANT'S CONVICTION FOR TERRORISTIC THREATS, N.J.S.A. 2C:12-3(a), MUST BE REVERSED BECAUSE THE COURT PROVIDED JURY INSTRUCTIONS THAT HAVE BEEN INVALIDATED BY STATE v. FAIR.[2] (Not Raised Below).

POINT IV

RESENTENCING IS REQUIRED FOR SEVERAL REASONS. (Partially Raised Below).

A. Because [d]efendant was convicted of attempted sexual assault, which is not an enumerated predicate offense under N.J.S.A. 2C:43-6.4(e), the court's imposition of the mandatory extended term statute was improper. (Not Raised Below).

B. Because [d]efendant was not advised that he would be subject to the mandatory extended term sentence under N.J.S.A. 2C:43-6.4(e), the court's imposition of that extended term was improper.

---

[2] 256 N.J. 213 (2024).

A-2520-22

C.  The court imposed a [thirty dollar] monthly penalty without considering whether [d]efendant had the ability to pay, in contradiction of N.J.S.A. 30:4-123.97.  (Not Raised Below).

I.

In point I defendant argues he was deprived of the constitutional right to counsel of his choosing.  He claims the trial judge denied his request for new counsel and to adjourn trial to retain private counsel without conducting the appropriate inquiry required by law, despite the fact there was good cause shown to appoint new counsel.

The Friday before jury selection was to begin, defense counsel moved to adjourn trial.  She asserted she was simultaneously preparing for trial and defendant's parole violation hearing, which was "akin to preparing for two different cases at the same time."  Counsel claimed that not granting the adjournment would create "a very viable automatic [post conviction relief (]PCR[)] claim because [she] . . . [would] not [be] able to one hundred percent concentrate on the trial or one hundred percent concentrate on the [parole violation] hearing, as [she would be] doing both at the same time."  The trial judge denied the motion and jury selection began as scheduled on Monday.

On the third day of jury selection, defendant moved for new counsel. Defense counsel advised the judge defendant wanted to retain a new attorney

10

because he "lost . . . confidence that [his counsel had] the ability to properly represent him in this matter." The trial judge responded that she was going to continue with jury selection. The following colloquy then ensued:

> [DEFENSE COUNSEL]: Your [h]onor, I do believe that in order for us to continue with jury selection[, defendant] has to be voir dired as to the understanding as he does have the right to retain the counsel of his . . . choice. . . .
>
> And in this case I believe that at the very least[, defendant] has to be voir dired as to the decision to go forward and the . . . [c]ourt has to provide him with the information he has to know either to continue pro se or give him the opportunity to retain counsel. . . .
>
> THE COURT: I'm not hearing you on . . . proceed[ing] pro se. I'm hearing that . . . he's not confident . . . in your abilities to defend him. I don't know where that's coming from. But I'm not hearing he wants to proceed pro se.
>
> [DEFENSE COUNSEL]: If I may, [y]our [h]onor. My understanding is . . . yesterday['s] . . . parole hearing did not happen due to a staff lapse [by] th[e] State . . . .
>
> Based on that . . . [defendant] essentially believed . . . that because I was not able to make that happen which doesn't have nearly as high of an implication for his freedom and for his ability to proceed, especially in [a] case such as this where because he is extended term [eligible] if he is convicted he faces a significant amount of jail time, that he does not believe that I have the ability to represent him in this matter[,] and I cannot be the person who makes sure that he has the best chance at freedom as possible. . . . [T]here's case law

11

that . . . he has the right to stop [the] proceeding, but also that his right to counsel of his choice would not be adhered to if we were to continue at this point.

The trial judge then questioned defendant:

THE COURT: [Defendant], your more than capable lawyer has indicated to me that it is your belief that she is no longer able to represent you adequately and you wish not to proceed with her as your attorney, is that right?

[DEFENDANT]: That's correct, [y]our [h]onor.

THE COURT: Okay. And do you have an attorney standing ready and willing to step in as we continue with our jury selection?

[DEFENDANT]: I do not. I'm currently in the process of retaining [an] attorney. My family has agreed to retain an attorney on my behalf. . . . I've waited patiently. It's been five years now and, [y]our [h]onor, I've waited patiently . . . and worked with my attorney to resolve . . . these issues . . . in this [c]ourtroom.

THE COURT: Resolve what issues?

[DEFENDANT]: The . . . issue . . . of my . . . charges . . . .

THE COURT: Okay. And you're here, sir, for your trial today.

[DEFENDANT]: That's correct, [y]our [h]onor. And . . . this is the sixth prosecutor and the fifth judge that I am now appearing in front of.

. . . .

12

THE COURT: Exactly . . . why we should be proceeding today.

[DEFENDANT]: . . . [Defense counsel] has not filed one motion . . . on my behalf throughout the entire five years despite my conversations with her and my suggestions to her about . . . what I want to happen in this . . . case . . . none of that has been adhered to.

THE COURT: Okay.

[DEFENDANT]: So I've been basically patiently [waiting] and nothing has been going on . . . without my input or . . . .

THE COURT: Okay.

[DEFENDANT]: . . . anything that I've had to say about this case. So . . . I'm basically tired. It's a fiasco[,] and I no longer want to be a part of it.

So what's going to happen on my part, judge, and [I] . . . certainly didn't want to come at the . . . [eleventh] hour with this nonsense . . . in my opinion. But I don't think she's effective as my counsel. And . . . my life is in the balance. So I'm not the type of person that's going to stand idly by [to] watch myself get hung.

THE COURT: Okay.

[DEFENDANT]: That's not going to happen.

THE COURT: [Defendant . . . .]

[DEFENDANT]: So what's going to happen for me, [y]our [h]onor, is I'm no longer going to participate. So I'm not going to ask the [c]ourt not to even bring me back here unless I have a new attorney. And so I would

13

just sit downstairs in the bull pen or I will stay at [the c]ounty [j]ail. And if you guys try to make me come back here involuntarily, then it's going to be a problem. I'm not going to come.

THE COURT: Okay. All right.

You don't want to participate, that's . . . your right not to participate if that's what you want to do.

[DEFENDANT]: That's correct.

THE COURT: Okay.

You're here today for jury selection. We're going to continue with jury selection and once trial starts— it's your position that you don't want to be a part of it.

[DEFENDANT]: Your [h]onor, I don't even want to stay here for jury selection.

THE COURT: Okay. That's his choice.

Jury selection continued. Trial counsel continued to represent defendant during the trial, until the Office of the Public Defender requested to have a pool attorney appointed for defendant, because continued representation by trial counsel would constitute a conflict.

After the verdict, defendant's new counsel moved for a new trial, alleging ineffective assistance of trial counsel. He claimed trial counsel failed to address the fact the victim and defendant had a long-term relationship and that she visited him while he was in prison on a prior offense. Defense counsel also

14

asserted trial counsel did not present witnesses to testify his alleged conduct was out of character and did not extensively cross-examine the victim about her inconsistent statements in describing the incident.

The trial judge denied the motion and made oral findings. She found trial counsel was not ineffective because the victim had testified about the nature of the parties' relationship before the incident. The decision not to introduce evidence the victim had visited defendant in jail was strategic because defense counsel may have not wanted to show defendant was incarcerated between 1998 and 2001. Eliciting character evidence was problematic "given . . . [d]efendant's record of similar conduct." Additionally, the judge concluded the extent of the cross-examination of the victim "would not have impacted the jury's ability to . . . assess[] . . . credibility of the underlying allegations made here."

The trial judge noted defendant did not retain private counsel, as he represented "nor was there any indication that private counsel had even be[en] consulted with any expectation of taking this case and being ready to try this case." After the parole violation hearing was adjourned, original trial counsel "indicated . . . she was prepared to move forward with this case." The judge observed that during her "colloquy with . . . [d]efendant he offered no time frames or any realistic possibility that he'd be able to retain counsel for the trial."

15

She found his assertion that he lacked confidence in trial counsel "suggested nothing more than a delay tactic."

The judge noted that in deciding to proceed with the trial, she considered the fact the case had been adjourned several times. She also considered "the nature of the allegations and the need to bring this matter to a close for both the victim and . . . [d]efendant." Furthermore, "[t]he State . . . and two competent assistant public defenders were available to try this case. Jurors, witnesses, and the victim were summoned for trial that was being conducted during the pandemic." The judge found "[d]efendant's efforts, . . . at delaying this matter under the guise of dissatisfaction with his assigned public defender was not a genuine attempt to obtain counsel of his choice."

A decision on whether to grant a continuance to a defendant who wants to change counsel is reviewed for an abuse of discretion. State v. Maisonet, 245 N.J. 552, 560 (2021). "The Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both guarantee all defendants in criminal prosecutions the right to have the assistance of counsel for their defense." State v. Outland, 245 N.J. 494, 505 (2021). Although that right generally includes a defendant's right to the counsel of their choice, "an indigent defendant who is represented by appointed counsel does not enjoy a

right to choose counsel. The Office of the Public Defender retains the flexibility to substitute one attorney from its office for another." State v. Kates, 426 N.J. Super. 32, 43 (App. Div. 2012) (citing State v. Williams, 404 N.J. Super. 147, 170 (App. Div. 2008)). "And all defendants must act 'with reasonable diligence' when choosing counsel to avoid delaying the efficient operation of the justice system." Maisonet, 245 N.J. at 566 (quoting Furguson, 198 N.J. Super. at 401).

"[A] court may not require the Public Defender to assign new counsel to a defendant who was dissatisfied with the attorney assigned to represent him, absent a showing of 'substantial cause.'" State v. Coon, 314 N.J. Super. 426, 438 (App. Div. 1998) (quoting State v. Lowery, 49 N.J. 476, 489-90 (1967)). "[A]n irreconcilable conflict establishes good [or substantial] cause . . . ." State v. Coclough, 459 N.J. Super. 45, 55 (App. Div. 2019) (citation omitted). So too does an attorney's failure to provide "loyal counsel" or "open communication." Ibid. (quoting State v. Miller, 216 N.J. 40, 63-64 (2013)). An assigned attorney is also required to advise the defendant and "do[] whatever possible to represent [the defendant] competently." State v. Rinaldi, 58 N.J. Super. 209, 214 (App. Div. 1959).

"A criminal defendant's constitutional guarantee of loyal counsel and open communication . . . does not equate to a guarantee of attorney-client rapport."

Miller, 216 N.J. at 64. "Disagreement over defense strategy does not rise to the level of good cause or substantial cause." Coon, 314 N.J. Super. at 438 (citing State v. Crisafi, 128 N.J. 499, 518 (1992)). Neither do the constitutional implications behind the right to counsel "guarantee that counsel appointed for a defendant shall measure up to [their] notions of ability or competency." Ibid.

A substantial cause analysis was not required here because defendant told the judge he was in the process of retaining an attorney with help from his family. Moreover, defendant's complaints about counsel regarded strategy. However, because defendant requested his public defender be replaced by private counsel, the judge needed to analyze the Furguson factors.

In considering whether to adjourn a matter for a defendant to seek new counsel, "the trial court must strike a balance between its inherent and necessary right to control its own calendar and the public's interest in the orderly administration of justice, on the one hand, and the defendant's constitutional right to obtain counsel of [their] own choice, on the other." Maisonet, 245 N.J. at 566 (2021) (quoting State v. Hayes, 205 N.J. 522, 538 (2011)). "To help trial judges balance the relevant interests when a defendant seeks an adjournment to

retain counsel, we adopted a series of factors from the D.C. Circuit's 1978 ruling in <u>Burton</u>."[3]  <u>Id.</u> at 566; <u>Furguson</u>, 198 N.J. Super. at 402.  They include:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.
>
> [<u>Furguson</u>, 198 N.J. Super. at 402 (quoting <u>Burton</u>, 584 F.2d at 490-91).]

"Trial courts have broad discretion in weighing the factors and striking the proper balance, and their decisions are entitled to deference on appeal." <u>Maisonet</u>, 245 N.J. at 566 (citations omitted).  Judges are "require[d] . . . to conduct a 'reasoned, thoughtful analysis'" of these factors when a defendant requests an adjournment to hire new counsel.  <u>Id.</u> at 559 (quoting <u>State v. Kates</u>,

---

[3]  <u>United States v. Burton</u>, 584 F.2d 485 (D.C. Cir. 1978).

216 N.J. 393, 396-97 (2014)).  "If a trial judge does not conduct the proper analysis . . . it may be necessary to reverse a conviction and start anew."  Id. at 560.

"An arbitrary or erroneous ruling that amounts to an actual deprivation of the right to counsel of one's choice . . . implicates structural error."  Id. at 566; see also United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006) (noting if there has been an "erroneous deprivation of the right to counsel of choice" such an error "unquestionably qualifies as 'structural error.'").  Structural errors "'defy analysis by harmless-error standards' because they 'affec[t] the framework within which the trial proceeds, and are not simply an error in the trial process itself.'"  Gonzalez-Lopez, 548 U.S. at 148 (alteration in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991)).  "Harmless-error analysis" in the context of the right to counsel of choice "would be a speculative inquiry into what might have occurred in an alternate universe."  Id. at 150.

"But courts cannot presume structural error from a trial court's failure to ask questions or make explicit findings about the Furguson factors if the record otherwise reveals that an adjournment to seek to hire new counsel was not appropriate under the circumstances."  Maisonet, 245 N.J. at 566-67.  "Instead, if an appellate court can glean or infer the relevant considerations from the

record, it can analyze the factors to determine whether the trial court abused its discretion in denying an adjournment." Id. at 567.

The State concedes the trial judge did not analyze the Furguson factors when defendant initially asked for new counsel and when she decided his motion for a new trial. Regardless, both parties assert the record is sufficient for us to decide the issue. We address the Furguson factors in turn.

As noted, defendant told the judge he was in the process of retaining an attorney with the help of his family. Although the judge found defendant provided "no time frames or any realistic possibility that he'd be able to retain counsel for the trial," she did not inquire about defendant's timeline to determine the length of the delay pursuant to the first Furguson factor. See Kates, 426 N.J. Super. at 52 ("[I]t was incumbent upon the court to inquire of defendant . . . , to determine the length of the requested delay . . . .").

The State's case was not complex: it called two fact witnesses and entered two photographs into evidence. There was no forensic evidence or expert testimony, and the fact witness testimony lasted one day, while the trial itself was just three days. These facts did not create a reasonable inference that the retention of new counsel would have caused a considerable delay. Thus, the first and eighth Furguson factors favored defendant.

Trial was initially scheduled to occur in 2018 but was adjourned to 2019 because defendant was diagnosed with prostate cancer and attended radiation therapy five days per week in January 2019. Thereafter, there were scheduling conflicts on both sides and in the court's schedule, which delayed the case into 2020, including the State's inability to reach the victim on several different dates and her diagnosis with multiple sclerosis. Trial was supposed to begin in February 2020, but defense counsel failed to appear, despite defendant being present and available. This was followed by the prosecutor being unavailable for the next scheduled date because of another ongoing trial. The onset of the COVID-19 pandemic one month later, delayed trial until March 2021 and required new pretrial conferences to ready the matter. Ultimately, trial took place in July 2021. Therefore, the second Furguson factor did not favor defendant.

The third factor, which requires the court to balance the convenience or inconvenience to the litigants, counsel, and court, "is measured, in part, by the timing of an adjournment request." Maisonet, 245 N.J. at 570. Although defendant made his request on the third day of jury selection, the judge did not inquire whether the State objected or if the parties' and witnesses' schedules

22

would permit an adjournment. The record also offers no indication of the court's own schedule.

The fourth <u>Furguson</u> factor favored defendant because he gave legitimate reasons for the delay, namely, defense counsel: not conducting motion practice during the entirety of her representation; allegedly ignoring his suggestions; and acting without his input. Defense counsel did not allay these concerns when she expressed the Friday before trial that she had not been able to focus on the trial, which would pose a "very viable" PCR claim if trial continued as scheduled. The trial judge did not address these issues.

The fifth factor did not favor defendant because he contributed to the delay. He acknowledged trial counsel had represented him for five years and outlined why he was unhappy with her representation. This showed he had enough time to retain his own attorney, but "did not act with reasonable diligence" to do so. <u>Maisonet</u>, 245 N.J. at 571.

There is insufficient evidence in the record to assess the sixth <u>Furguson</u> factor. Although defendant told the judge he was retaining an attorney, the judge made no inquiry into who defendant had contacted, when he planned to retain them, or whether that attorney would be prepared to try the case. The circumstances called for a more thorough inquiry as to defendant's reasons for

wanting new counsel at such a late date and an explanation of why the judge considered defendant to be a delay tactic.

Similarly, the trial judge made no findings about whether there was an identifiable prejudice to defendant by denying his request as required under the seventh factor. However, prejudice was inferable from trial counsel's trepidation about trying the case.[4] There was also actual prejudice as evidenced by trial counsel's failure to cross-examine the victim on her prior inconsistent statement to Detective Zavistoski. The victim told the detective defendant "punched her in the face, leaving her with a black eye, a busted lip[,] and a cut on her eye." At trial, the victim testified defendant only "grazed" her nose and the pictures introduced by the State did not show the injuries she had described to the sergeant. The victim also told Detective Zavistoski that defendant said he would break her neck, but she did not testify to that at trial.

Although we do not comment on its admissibility because it is a matter of the trial judge's discretion, we note trial counsel had evidence the victim had been previously convicted of filing a false police report in an unrelated proceeding. There was also a witness prepared to testify the victim had a

---

[4] Trial counsel's comments about not being able to try the case also satisfied the ninth catchall factor under Furguson.

reputation for lying and others who would testify the crime was out of character for defendant, but they were never called. The defense had access to defendant's medical records from the same year as the offense, showing he suffered from erectile dysfunction due to the cancer, which was not adduced.

Our review of the record shows the majority of the Furguson factors favored defendant, and the trial judge misapplied her discretion by not assessing all the factors and making the appropriate findings. We are constrained to conclude this was a structural error, which deprived defendant of his constitutional right to counsel of his choice. For these reasons, we vacate defendant's convictions and remand for a new trial.

## II.

Because we have ordered a new trial, we need not reach the arguments defendant raises in points I.C., II, or IV. As for point III, the State, in its Rule 2:6-11(d) submission, concedes our recent decision in State v. Russell, ___ N.J. Super. ___, ___ (2025) controls. Russell afforded Fair pipeline retroactivity. Fair held when a jury is adjudicating whether a defendant is guilty of terroristic threats, they must be instructed to consider the context and perspective of one similarly situated to the victim. The State nonetheless urges the lack of an instruction under Fair was harmless error.

"Appropriate and proper charges are essential for a fair trial." State v. Scharf, 225 N.J. 547, 581 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). "[E]rroneous instructions on material points are presumed" to be prejudicial. State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)). "Such errors are 'poor candidates for rehabilitation under the harmless error philosophy.'" State v. Vick, 117 N.J. 288, 289 (1989) (quoting State v. Crisantos (Ariagas), 102 N.J. 265, 273 (1986)).

Russell noted Fair announced "a new rule of constitutional dimensions," which affects "a defendant's right to a fair trial." ___ N.J. Super. at ___ (slip op. at 13-14). We concluded it was, therefore, essential to afford the new rule pipeline retroactivity to "ensure the ability to timely review and correct a criminal conviction," and avoid wrongful convictions. Id. at ___ (slip op. at 14). For these reasons, we part ways with the State's view that defendant's terroristic threats convictions could survive under a harmless error analysis.

Vacated, reversed, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2520-22